******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ALPHA BETA CAPITAL PARTNERS,
L.P. *v.* PURSUIT INVESTMENT
MANAGEMENT, LLC, ET AL.
(AC 39388)

Lavine, Bright and Bishop, Js.

*Syllabus*

The plaintiff company sought to recover damages from the defendants for, inter alia, breach of contract for their failure to remit to the plaintiff its proportionate share of certain proceeds secured by a settlement agreement. The defendants S and C are individuals who, together, formed, operated, and controlled the defendant companies, O Co., F Co., C Co., M Co., P Co., I Co. and N Co. In approximately 2007, the plaintiff invested in both O Co. and C Co. and, as a result, acquired limited partnership interests in those companies. In 2007, F Co. and M Co. had purchased certain securities known as collateralized debt obligations from U Co. and, in 2008, after the value of the collateralized debt obligations precipitously dropped, P Co. and I Co. commenced a civil action alleging fraud against U Co. In April, 2009, the plaintiff executed a limited partnership agreement for C Co., which contained certain provisions for withdrawals by and distributions to limited partners. In September, 2009, the plaintiff redeemed its investment in O Co., which extinguished its interest in that company except for certain holdbacks to indemnify potential future expenses of O Co. In 2010, the plaintiff commenced a civil action in the Supreme Court of the state of New York against I Co., S, and C, and filed a separate arbitration proceeding against O Co. and C Co. In April, 2011, the plaintiff, I Co., S, C, O Co., C Co., and A Co., the former general partner of C Co., executed a confidential settlement agreement to resolve the 2010 New York action and the arbitration proceeding. As consideration for the plaintiff's withdrawal and release, § 3 of the settlement agreement required I Co. to pay the plaintiff a settlement payment, as well as a redemption payment, which represented the plaintiff's pro rata share, approximately 32.083612 percent, of the net asset value in C Co. as of February 28, 2011, minus a holdback of $250,000 for the purpose of funding costs associated with the ongoing 2008 action against U Co., and minus an additional holdback of $200,000 to pay legal fees and expenses. In addition, § 4 of the settlement agreement secured the plaintiff's interest in two of C Co.'s contingent assets by providing that nothing in the settlement agreement shall affect the plaintiff's pro rata share in C Co.'s proportionate interest in the U Co. litigation proceeds or in C Co.'s interest in a claim against L Co. Shortly after the settlement agreement was signed, the L Co. claim was sold for $9,334,141.55, but no portion of the L Co. claim proceeds were remitted to the plaintiff until October, 2011, when the plaintiff received $1,022,022.36. In 2013, the plaintiff commenced a civil action in the Supreme Court of the state of New York against I Co., C Co., O Co., and A Co., alleging that those defendants had breached the settlement agreement by, inter alia, failing to pay the plaintiff its pro rata portion of the L Co. claim proceeds. Soon after the commencement of the 2013 New York action, certain of the defendants transferred to the plaintiff approximately $700,000 in additional proceeds from the L Co. claim, for a total distribution of $1,722,022.36. In 2015, P Co. settled the U Co. litigation for a total of $36 million, but the defendants have not provided the plaintiff with any portion of the settlement proceeds. The plaintiff then brought the present action against the defendants seeking damages for their failure to remit to the plaintiff its proportionate share of the U Co. litigation proceeds as secured by § 4 of the settlement agreement. The plaintiff filed an application for a prejudgment remedy, and the plaintiff's operative amended substitute complaint alleged, inter alia, breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, statutory theft (§ 52-564), and violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.). Subsequently, the defendants filed a motion to strike the plaintiff's

complaint, which the court granted only as to the claims of statutory theft and a CUTPA violation. The court also granted the plaintiff's application for a prejudgment remedy, and the plaintiff thereafter secured the full attachment amount. In October, 2016, the court rendered judgment partially in favor of the plaintiff as to certain defendants on its complaint and in favor of the plaintiff on a counterclaim filed by the defendants. In particular, the court concluded that the defendants that were parties to the settlement agreement, namely, C Co., O Co., I Co., S, and C, as well as N Co., the general partner of C Co. at the time the U Co. litigation proceeds were realized, were liable for breach of contract and breach of the implied covenant of good faith and fair dealing for their intentional failure to remit to the plaintiff its proportionate share of the U Co. litigation proceeds as secured by the settlement agreement. The defendants appealed and the plaintiff cross appealed to this court. During the pendency of this appeal, the plaintiff, pursuant to statute (§ 52-278k), filed a motion with the trial court seeking modification of the previously secured prejudgment remedy attachment amount to secure from C Co., O Co., I Co., S, C, and N Co., an additional $947,731 that it anticipated would accrue during the pendency of this appeal. The plaintiff also filed a motion with the court seeking supplemental asset disclosure from those defendants to assist with the securing of the additional attachment pursued by the motion to modify. Subsequently, the trial court granted those two motions, and the defendants filed an amended appeal with this court. *Held*:

1. The defendants could not prevail on their claim that the trial court improperly interpreted the agreements between the parties when it concluded that the plaintiff prevailed on its breach of contract claim, which alleged that the defendants had failed to pay the plaintiff its proportionate share of the proceeds from the U Co. litigation, as the court properly held that the plaintiff proved a breach of contract because the defendants settled the U Co. litigation for $36 million, and the plaintiff has not received its portion of those proceeds in contravention of the settlement agreement and the limited partnership agreement: the defendants' claim that they could not be held liable for breach of the settlement agreement because, pursuant to § 4 of that agreement, the distribution of the proceeds from the contingent assets was governed by all of provisions of the limited partnership agreement, which afforded the general partner discretion to withhold or reduce payment of the contingent interests, was unavailing, as the trial court correctly determined that the execution of the settlement agreement constituted a withdrawal of the plaintiff as a limited partner from C Co. and properly concluded, in light of that withdrawal, that the payment of the contingent assets was to be governed by the specific withdrawal provision of the limited partnership agreement, and the court's interpretation of both the settlement agreement and the limited partnership agreement together was further bolstered by the relevant portion of the withdrawal provision of the limited partnership agreement, which provides that a withdrawal was subject to certain restrictions and reserves for contingent or undetermined liabilities of C Co., as the parties specifically identified those restrictions and reserves in the settlement agreement's holdback provisions, and it was logical for the court to conclude that, following C Co.'s receipt of proceeds from the realization of a contingent asset, the plaintiff, pursuant to § 4 of the settlement agreement and § 5.01 of the limited partnership agreement, was entitled to its pro rata share of those proceeds in cash as soon as practicable following the effective date of the withdrawal; accordingly, the trial court properly considered the language of § 4 of the settlement agreement in conjunction with the other provisions of the settlement agreement, the limited partnership agreement, the relation of the parties, and the circumstances under which it was executed.

2. The defendants' claim that the trial court improperly rejected their breach of contract counterclaim, which alleged that they were relieved of their obligation to remit the U Co. litigation proceeds because the plaintiff had breached the settlement agreement, was unavailing:

   a. The defendants could not prevail on their claim that the trial court erroneously found that the plaintiff had not materially breached the settlement agreement by violating § 7 when it requested that R Co., the plaintiff's law firm, contact the United States Securities and Exchange Commission regarding an ongoing investigation, by commencing the 2013 New York action seeking an injunction to prevent C Co. from utilizing the U Co. litigation holdback, and by colluding with S Co.; that

court's finding that the plaintiff's actions did not constitute a material breach of the settlement agreement, the essential purpose of which was to resolve the then existing disputes among the parties, was not clearly erroneous and was supported by the evidence that § 7 was not central to the settlement agreement, that the plaintiff sought information from the United States Securities and Exchange Commission regarding an ongoing investigation in which the plaintiff's interests were potentially involved, that the plaintiff filed an action in New York alleging that the defendants had breached the settlement agreement, and that the plaintiff had communicated with S Co. after it already had been advised of the settlement agreement, as those actions were taken by the plaintiff to enforce its rights that were at the core of the settlement agreement.

b. The defendants could not prevail on their claim that the trial court erroneously found that their prior partial delayed payment of the L Co. claim to the plaintiff relieved the plaintiff from its obligations under the confidentiality provision, as the court's finding that any claimed breach by the plaintiff was excused by the defendant's prior breach of the settlement agreement was not clearly erroneous; the evidence demonstrated that the settlement agreement, read in conjunction with the limited partnership agreement, obligated the payment of the contingent assets, including the pro rata share of the proceeds of the L Co. claim, approximately $2,994,729.76, to the plaintiff in cash as soon as practicable following the effective date of the withdrawal on June 1, 2011, and that no portion of the L Co. claim proceeds were remitted to the plaintiff until October, 2011, when the plaintiff received $1,022,022.36, and, even if the defendants' calculation as to the plaintiff's proportionate share of the L Co. claim was correct, the evidence that, prior to any of the contested communications, the plaintiff received less than one half of what the defendants had calculated was the plaintiff's entitlement, more than four months after the funds had been received by C Co. without sufficient justification, supported the court's finding that the defendants had materially breached the settlement agreement.

3. The trial court properly concluded that the plaintiff prevailed on its breach of the implied covenant of good faith and fair dealing claim; that court found that the signatory defendants, I Co., O Co., C Co., S, and C, deprived the plaintiff of its right to receive the benefits under the settlement agreement, under which they had a clear obligation to remit the U Co. litigation proceeds to the plaintiff, and the trial court's conclusion that at least some of the defendants breached the implied covenant of good faith and fair dealing was supported by its findings that the defendants failed to remit the U Co. litigation proceeds to the plaintiff, wilfully attempted to thwart the plaintiff's ability to receive those proceeds, raised unsupported claims and counterclaims that alleged misconduct by the plaintiff, maintained control over the proceeds so as to retain them for as long as possible for their own benefit, continued to prolong the litigation and cause excessive expenses, and failed, until ordered by the court, to provide information to the plaintiff that could have resolved some of the issues in advance of this litigation.

4. The plaintiff's claim on cross appeal that the trial court improperly concluded that the plaintiff could not prevail on its conversion claim was unavailing, as the court properly concluded that the plaintiff could not prevail on its conversion claim because it merely was a recasting of its breach of contract claim; the plaintiff's conversion claim sought the same damages as its breach of contract claim, namely, its proportionate share of the U Co. litigation proceeds, the plaintiff's conversion claim alleged the same breach of duty, namely, the defendants' obligation pursuant to the settlement agreement and the limited partnership agreement to remit the U Co. litigation proceeds to the plaintiff, and the plaintiff's conversion claim was based on the exact same allegations as its breach of contract claim because the plaintiff's complaint entirely incorporated the breach of contract allegations into its count alleging conversion.

5. The plaintiff could not prevail on its claim that the trial court improperly granted the defendants' motion to strike its Connecticut statutory causes of action for statutory theft and a violation of CUTPA on the ground that those claims were barred by § 12 of the settlement agreement, which provides in relevant part that any disputes or litigation arising out of that agreement "shall be governed by New York law"; the relevant language in § 12 of the settlement agreement is broad and does not apply only to breach of contract causes of action, and the plaintiff's

statutory causes of action arose out of the settlement agreement because the basis for both claims stemmed from the settlement agreement, as the statutory theft claim alleged that the defendants withheld and utilized for themselves the U Co. litigation proceeds, and the CUTPA claim alleged that the defendants breached the settlement agreement and failed to provide the plaintiff its share of the U Co. litigation proceeds.

6. The plaintiff could not prevail on its claim that all of the defendants should be held liable for the plaintiff's claims of breach of contract and breach of the implied covenant of good faith and fair dealing pursuant to a piercing the corporate veil or alter ego theory, and that the trial court improperly declined to consider those theories despite the fact that they had been pleaded and briefed; when construing the trial court's judgment as a whole, it was apparent that although the court recognized that the plaintiff had not separately pleaded its piercing the corporate veil and alter ego theories, and although the court did not engage in a discussion of each and every element of the plaintiff's theories, it considered and rejected those theories.

7. The trial court improperly interpreted the settlement agreement to conclude that all of the defendants who were signatories to the settlement agreement, I Co., O Co., C Co., S, and C, as well as N Co. as successor general partner of C Co., were liable for nonpayment of the U Co. litigation proceeds, as only I Co., C Co., and N Co. were liable: although that court correctly concluded that there was no express limitation in § 4 of the settlement agreement as to which defendants had the obligation to remit the U Co. litigation proceeds, the court erred in literally interpreting certain language in the settlement agreement to hold all of the signatory defendants liable for each and every obligation in the settlement agreement, and it improperly failed to consider the limited partnership agreement or the circumstances under which the settlement agreement was executed, as O Co. could not be held liable pursuant to § 4 of the settlement agreement because it was unable to remit the U Co. litigation proceeds to the plaintiff, and S and C could not be held individually liable in the absence of an express agreement by them to undertake an individual obligation in either the settlement agreement or the limited partnership agreement to remit the U Co. litigation proceeds as soon as practicable; moreover, the defendants could not prevail on their claim that the proper interpretation of the limited partnership agreement and the settlement agreement required that only N Co. be held liable for nonpayment of the U Co. litigation proceeds, as the defendants that are liable for nonpayment are those that both undertook an obligation and had the ability to pay the U Co. litigation proceeds, namely, C Co., as owner of the interest in the U Co. litigation proceeds at issue, N Co., as general partner of C Co., and I Co., which had remitted both the settlement payment and redemption payment on behalf of the defendants, including C Co., pursuant to the settlement agreement.

8. The defendants could not prevail on their claim that the trial court erroneously awarded damages because it failed to reduce C Co.'s share of the U Co. litigation proceeds by 10 percent to account for M Co.'s other investor, H Co., which is another entity controlled by S and C: the trial court's finding that C Co. was the sole investor in M Co. and, thus, that C Co. was entitled to all of M Co.'s share of the proceeds from the settlement of the U Co. litigation, was supported by the court's findings regarding the lack of credibility of the defendants' position regarding $1.1 million that S and C had deposited into an account of M Co., the defendants' failure to comply fully with discovery, and the lack of credibility of the testimony of S, and that the investment was withdrawn prior to the execution of the settlement agreement, as well as evidence that S and C, through H Co., made their investment in M Co. after the collateralized debt obligations had been purchased, after the collateralized debt obligations had lost value, and after the U Co. litigation had been commenced; moreover, the defendants could not prevail on their claim that the trial court erroneously awarded damages because it failed to account for a performance fee reduction from the U Co. litigation proceeds, which was based on their claim that the limited partnership agreement provides that the general partner of C Co., N Co. at the time, was entitled to a 20 percent performance fee for net economic profit, as the limited partnership agreement definitively provides that losses incurred by a limited partner prior to the execution of the limited partnership agreement are to be taken into account when determining cumulative fiscal period net economic profit and, thus, the trial court correctly

concluded that the U Co. litigation proceeds did not constitute a net profit because those proceeds only partially recouped prior substantial losses incurred in connection with the collateralized debt obligations.

9. The plaintiff could not prevail on its claim that the trial court erroneously awarded damages because it improperly permitted the defendants to retain the remainder of the U Co. litigation holdback, which was based on the plaintiff's claim that the court, having found that the $250,000 holdback designated by the settlement agreement to cover expenses incurred in connection with the U Co. litigation had not been exhausted, erroneously failed to award damages for the remainder of the unused U Co. litigation holdback: that court definitively concluded that there was insufficient evidence to conclude that the U Co. litigation holdback had been exhausted, and did not conclude, as claimed by the plaintiff, that the evidence demonstrated that the holdback had not been exhausted, and the plaintiff's claim that the trial court erroneously found the division of the U Co. litigation proceeds to be 52.8 percent to M Co. and 47.2 percent to F Co., and that the court should have drawn an adverse inference against the defendants for their failure to comply fully with discovery was unavailing, as the trial court specifically rejected the plaintiff's credibility challenge to the position taken by the defendants, this court could not second-guess that credibility assessment, and the testimony and evidence cited by the court were sufficient to support its conclusion; accordingly, the court's finding as to the division of the net proceeds of the U Co. litigation was not clearly erroneous, and the court properly determined the amount of damages.

10. The defendants could not prevail on their claim that the trial court improperly granted the plaintiff's motion to increase the amount of the prejudgment remedy, which was based on their claim that the filing of an appeal, without more, did not constitute a sufficient basis for the court to modify, pursuant to § 52-278k, the existing prejudgment remedy; it was not clear error for the trial court to have increased the amount of the prejudgment remedy, as the court made its probable cause determination on the basis of the amount of the judgment rendered against the defendants, the court's award of postjudgment interest, the fact that the defendants took an amended appeal, and the average pendency of similar civil cases before this court.

This court declined to review the defendants' unpreserved claim that the trial court improperly granted the plaintiff's motion for postjudgment discovery in connection with the court's upward modification of the prejudgment remedy amount, the defendants having failed to preserve properly their claim that the trial court lacked authority to grant the plaintiff's supplemental motion for disclosure of assets.

Argued November 27, 2018—officially released October 8, 2019

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the Complex Litigation Docket, where the defendants filed a counterclaim; thereafter, the court, *Genuario, J.*, granted the plaintiff's application for a prejudgment remedy; subsequently, the court granted in part the defendants' motion to strike; thereafter, the court denied the defendants' motion to reargue and for reconsideration, and the named defendant et al. appealed to this court; subsequently, the matter was tried to the court, *Genuario, J.*; thereafter, the court, *Genuario, J.*, denied the motion to modify the prejudgment remedy filed by the defendant Pursuit Partners, LLC, et al.; judgment in part for the plaintiff on the complaint and for the plaintiff on the counterclaim, from which the named defendant et al. appealed and the plaintiff cross appealed to this court; subsequently, the court, *Genuario, J.*, granted the plaintiff's motion to modify the prejudgment remedy attachment and the

plaintiff's motion for disclosure of assets, and the named defendant et al. filed an amended appeal with this court; thereafter, the court, *Genuario, J.*, denied the motion to open the judgment and to modify the interest rate filed by the named defendant et al., and the named defendant et al. filed a second amended appeal with this court. *Reversed in part*; *judgment directed.*

*Michael S. Taylor*, with whom were *Brendon P. Levesque* and, on the brief, *James P. Sexton* and *Megan L. Wade*, for the appellants-cross appellees (named defendant et al.).

*Edward P. Dolido*, pro hac vice, with whom were *James C. Graham* and, on the brief, *Anthony C. Famiglietti*, *Bijan Amini*, and *Kelly McCullough*, for the appellee-cross appellant (plaintiff).

*Opinion*

BRIGHT, J. This appeal arises out of a dispute between the plaintiff, Alpha Beta Capital Partners, L.P., and the defendants Pursuit Opportunity Fund I, L.P. (POF), Pursuit Opportunity Fund I Master Ltd. (POF Master), Pursuit Capital Management Fund I, L.P. (PCM), Pursuit Capital Master (Cayman) Ltd. (PCM Master), Pursuit Partners, LLC (Pursuit Partners),[1] Pursuit Investment Management, LLC (PIM), Northeast Capital Management, LLC (Northeast), Anthony Schepis, and Frank Canelas, Jr. The central issue of this appeal is the defendants' claim that the court improperly interpreted the agreements between the parties to hold that certain defendants were liable for their failure to distribute to the plaintiff its share of a substantial contingent asset in which it had an interest.

The defendants appeal, and the plaintiff cross appeals, from the judgment of the trial court, rendered after a bench trial, partially in favor of the plaintiff as to certain defendants on its complaint and in favor of the plaintiff on the defendants' counterclaim.[2] The defendants also appeal from the orders of the trial court granting the plaintiff's postjudgment motion to increase the amount of a previously secured prejudgment remedy, and granting the plaintiff's motion for discovery to secure the additional prejudgment remedy attachment.

Addressing the parties' various contentions, we conclude that (1) the court properly interpreted the agreements between the parties in concluding that the plaintiff prevailed on its breach of contract claim, (2) the court properly rejected the defendants' breach of contract counterclaim, (3) the court properly concluded that the plaintiff prevailed on its breach of the implied covenant of good faith and fair dealing claim, (4) the court properly concluded that the plaintiff could not prevail on its conversion claim, (5) the court properly struck the plaintiff's Connecticut statutory causes of action, (6) the court improperly concluded that all of the defendants who had signed the settlement agreement were liable for breach of contract and for breach of the implied covenant of good faith and fair dealing, (7) the court properly determined the amount of damages awarded to the plaintiff, (8) the court properly granted the plaintiff's motion to increase the amount of the prejudgment remedy, and (9) the defendants' claim that the court improperly granted the plaintiff's motion for postjudgment discovery was not properly preserved, and, thus, we decline to review it. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The plaintiff is a limited partnership organized under the laws of the state of Delaware. POF and PCM

are both hedge funds[3] that were formed as Delaware limited partnerships. POF Master and PCM Master are both hedge funds that were formed as Cayman Islands limited liability companies. The vast majority of investments in POF Master were made by POF, and, likewise, the vast majority of investments in PCM Master were made by PCM. Pursuit Partners[4] and PIM are Delaware limited liability companies, each with a principal place of business in Greenwich, Connecticut. PIM provided advisory and investment management services to POF, PCM, POF Master, and PCM Master. Northeast is a limited liability company that became the general partner of PCM on February 17, 2014, which was after the prior general partner, Pursuit Capital Management, LLC (Pursuit Management), had filed for bankruptcy. Schepis and Canelas are individuals who reside in Greenwich, Connecticut, and who, together, formed, operated, and controlled all of the other defendants. At one point in time, the defendants cumulatively managed assets in excess of $600 million. During all relevant times, the plaintiff was represented by the law firm Reed Smith, and the defendants were represented by the law firm DLA Piper.

In approximately 2007, the plaintiff invested in both POF and PCM.[5] In return, the plaintiff acquired limited partnership interests in POF and PCM, and became a signatory to both the POF and PCM limited partnership agreements. Also invested in POF and PCM at that time was the Schneider Group, which was comprised of various persons and entities, including Leslie Schneider, Lillian Schneider, Claridge Associates, LLC, and Jamus Scott, LLC. In 2007 and 2008, all of the defendants were experiencing significant financial difficulties as a result of the volatility of the global securities market. More specifically, in 2007, POF Master and PCM Master had purchased certain securities known as collateralized debt obligations (CDOs)[6] from UBS AG, or its affiliate, for substantial sums of money. Shortly thereafter, the value of the CDOs precipitously dropped and, in 2008, Pursuit Partners and PIM commenced a civil action in the Connecticut Superior Court against UBS AG and Moody's Corporation (UBS litigation), alleging "a fraud . . . committed by [UBS AG and UBS Securities, LLC], upon [POF Master and PCM Master] in connection with [those entities'] purchase of CDOs from [UBS AG and UBS Securities, LLC]." *Pursuit Partners, LLC* v. *UBS AG*, Superior Court, judicial district of Stamford-Norwalk, Complex Litigation Docket, Docket No. CV-08-4013452-S (September 8, 2009) (48 Conn. L. Rptr. 557, 558). POF Master and PCM Master were not parties to that action even though they were the actual purchasers of the CDOs from UBS AG and UBS Securities, LLC.

In 2009, the investors in POF and PCM were provided an opportunity to redeem their investments and to withdraw their partnership interests from POF and PCM. A majority of the investors chose to redeem. In Septem-

ber, 2009, the plaintiff redeemed its investment in POF, which extinguished its interest in POF except for certain holdbacks[7] to indemnify potential future expenses of POF. Nevertheless, the plaintiff, as well as the Schneider Group, chose to remain invested in PCM and, as a result, between them, they cumulatively held approximately two thirds of the equitable interest in PCM.

On or about April 1, 2009, the plaintiff executed the "Amended and Restated Limited Partnership Agreement" (LPA) for PCM, which was drafted by one or more of the defendants under the supervision of Schepis and Canelas. The LPA did not require or contemplate any new investment; rather, the plaintiff retained its interest in PCM consistent with the terms of the LPA on the basis of its previous investment in PCM. The LPA contained certain provisions for withdrawals by and distributions to limited partners.

In 2010, the plaintiff commenced a civil action in the Supreme Court of the state of New York (2010 New York action) against PIM, Schepis, and Canelas. Therein, the plaintiff alleged that PIM, Schepis, and Canelas were liable for substantial damages caused by their "tortious conduct involving the management of its investments in the hedge funds." Contemporaneously, the plaintiff filed a separate arbitration proceeding against POF and PCM, claiming similar losses for similar tortious conduct. In that proceeding, the plaintiff alleged, among other things, that one or more of the defendants had paid themselves compensation on the basis of a highly inflated value of the CDOs, notwithstanding their knowledge that the CDOs had little or no value.[8]

On or about April 8, 2011, the plaintiff, PIM, Schepis, Canelas, Pursuit Management, POF, and PCM executed the "Confidential Settlement Agreement and Mutual Release" (CSA) to resolve the 2010 New York action and the arbitration proceeding. The CSA was comprised of fifteen sections and provided at the outset that "the [p]arties hereby agree as follows . . . ." In §§ 1, 2, 5, and 6, the CSA provided that the plaintiff was to execute a dismissal with prejudice as to both the 2010 New York action and the parallel arbitration proceeding, and that the plaintiff agreed to a mutual release with PIM, Schepis, Canelas, Pursuit Management, POF, and PCM of all claims that were, or could have been, raised therein.

As consideration for the plaintiff's withdrawal and release, § 3 of the CSA required PIM to pay the plaintiff a settlement payment of $2.2 million and a redemption payment of $1,418,033. Pursuant to § 3 (b) (i) and (iii) of the CSA, the amount of the redemption payment represented the plaintiff's pro rata share, approximately 32.083612 percent, of the net asset value (NAV) in PCM as of February 28, 2011,[9] minus a holdback of "$250,000 for the purpose of funding necessary costs . . . associated with the ongoing [UBS litigation]" and minus "an

additional holdback in the amount [of] $200,000 to pay legal fees and expenses with respect to which PCM has an obligation to indemnify." Section 3 (b) (ii) of the CSA provided detailed mandates regarding these holdbacks, including that PIM shall not use any prior holdbacks in connection with the UBS litigation, that the plaintiff shall "be entitled to periodic updates on the status of the holdbacks," and that the plaintiff "will be provided with the opportunity to pay additional expenses necessary for the UBS [l]itigation" if the UBS litigation holdback was insufficient.

In addition, § 4 of the CSA secured the plaintiff's interest in two of PCM's contingent assets. Section 4 of the CSA provided in relevant part that "PCM owns certain contingent assets that were valued at zero . . . for purposes of calculating PCM's NAV. These contingent assets include (a) PCM's proportionate interest in the UBS [l]itigation; and (b) PCM's interest in a claim against Lehman Brothers International (Europe) . . . in the amount of approximately $14,000,000 [(LBIE claim)]. Nothing herein . . . shall affect in any way [the plaintiff's] pro rata share . . . of the contingent assets as of February 28, 2011. It is further understood that [the plaintiff's] continued interest in the contingent assets shall be governed by the [LPA] . . . ."

Section 7 of the CSA was a confidentiality provision in which the parties agreed, among other things, "to maintain in the strictest confidence and not disclose . . . the contents and terms of [the CSA] . . . [and] not to use or provide any information relating to any claim arising out of an investment in the [f]unds to any other person in connection with the initiation of any lawsuit, claim, arbitration or action related to or concerning any investment in PCM, POF or any other investment vehicle managed by PIM." Section 12 of the CSA was a choice of law provision that provided: "This [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of New York. Any disputes or litigation arising out of this [a]greement shall be governed by New York law."

On or about April 28, 2011, PIM sent a letter to the remaining investors in PCM, notifying them that the plaintiff's claims against PCM had been settled, that PIM was effecting a " 'mandatory withdrawal' " of the plaintiff's limited partnership interest, and that the plaintiff would maintain its proportionate interest in the two contingent assets. On or about April 30, 2011, Schepis, in his capacity as the managing member of the general partner of PCM, acting on behalf of the limited partners, executed "Amendment No. 1" to the LPA. That amendment set forth certain terms governing the withdrawn investors' continued interest in the contingent assets, the right of the general partner to be paid an incentive fee, and the right of the general partner to withhold reserves, costs, and expenses from any

distribution of the proceeds of the contingent assets.

Shortly after the CSA was signed, the LBIE claim was sold for $9,334,141.55, and, on June 1, 2011, those funds were received in PCM Master's account. Nevertheless, no portion of the LBIE claim proceeds were remitted to the plaintiff until October, 2011, when the plaintiff received $1,022,022.36. Thereafter, a series of communications occurred between Reed Smith and DLA Piper regarding the distribution of the LBIE claim proceeds to the plaintiff.

On November 9, 2011, DLA Piper sent an explanation to Reed Smith, stating that the plaintiff's contingent interest in the LBIE claim was worth $2,691,641, which amount represented 32.08 percent of PCM's 90 percent interest in the LBIE claim owned by PCM Master, and that a performance fee also would be subtracted from that amount. On November 16, 2011, Reed Smith sent a letter in response, asserting that the defendants had provided no documentation to support their valuation of the plaintiff's proportionate interest in the LBIE claim, that Reed Smith had been in contact with the Schneider Group and their related entities, and that the Schneider Group was supporting the plaintiff's demands. On November 26, 2011, DLA Piper sent another explanation to Reed Smith, stating that the plaintiff's interest in the LBIE claim was reduced to $2,132,559 to account for the performance fee due to the defendants, and that the plaintiff's "reserve balance in May, 2011, was adjusted upward in that amount." Neither of DLA Piper's communications provided an explanation as to the basis for the performance fee or the balance reserve, nor the reason for which the defendants had remitted less than 48 percent of the total amount that they finally had calculated the plaintiff's interest in the LBIE claim to be worth. The defendants did not remit any further amount of the LBIE claim at that time.

On November 6, 2012, the court dismissed the UBS litigation for lack of subject matter jurisdiction on the ground that Pursuit Partners and PIM lacked standing to proceed against UBS AG and Moody's Corporation. On December 4, 2012, lead counsel for Pursuit Partners in the UBS litigation sent a letter to the investors, including the plaintiff, explaining that the case had been dismissed, that he disagreed with the decision, that he had filed a motion to reargue, that the investors should not take any action that would interfere with the process, and that he was confident that they ultimately would prevail.

In March, 2013, after having received no further communication regarding the LBIE claim and concerned about the status of its holdbacks, the plaintiff commenced a civil action in the Supreme Court of the state of New York against PIM, PCM, POF, and Pursuit Management (2013 New York action).[10] In that action, the

plaintiff alleged that those defendants had breached the CSA by failing to pay the plaintiff its pro rata portion of the LBIE claim proceeds, and by failing to provide the plaintiff with periodic updates on the status of its holdbacks and contingent assets. Accordingly, the 2013 New York action did not seek the UBS litigation proceeds, as the UBS litigation had not yet been resolved; rather, the plaintiff sought an accounting and an injunction to prevent those defendants from accessing or utilizing the plaintiff's holdbacks.

Soon after the commencement of the 2013 New York action, the defendants, or some of them, transferred to the plaintiff approximately $700,000 in additional proceeds from the LBIE claim, for a total distribution of $1,722,022.36, which was approximately 81 percent of the total amount that the defendants finally had calculated the plaintiff's interest in the LBIE claim to be worth. The transmittal of the $700,000 was not accompanied by any explanation or accounting as to how the amount was calculated, the balance of the LBIE claim proceeds, or the status of the holdbacks. Even though it mandatorily had withdrawn the plaintiff as a member of PCM in April, 2011, when the CSA was executed, on April 22, 2013, Pursuit Management sent the plaintiff a letter executing its purported right, pursuant to the LPA, to " 'mandatorily withdraw' " the plaintiff from PCM,[11] which allegedly terminated any interest the plaintiff had in the contingent assets. The purported basis for this second mandatory withdrawal was the initiation of the 2013 New York action.

On July 3, 2014, the court in the UBS litigation, after reconsideration, vacated the judgment dismissing the UBS litigation and held that Pursuit Partners and PIM had standing on the basis of the unique and unitary relationship between the various entities that make up and control the hedge fund structure. In August and September, 2015, Pursuit Partners settled the UBS litigation for a total of $36 million; however, the defendants have not provided the plaintiff with any portion of the settlement proceeds.

The plaintiff then brought the present action against the defendants seeking damages for their failure to remit to the plaintiff its proportionate share of the UBS litigation proceeds as secured under § 4 of the CSA.[12] On September 11, 2015, the plaintiff filed an application for a prejudgment remedy and a proposed summons and complaint against the defendants. The plaintiff's operative amended substitute complaint, dated May 6, 2016, is comprised of seven counts: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) unjust enrichment, (4) conversion, (5) statutory theft under General Statutes § 52-564, (6) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (7) civil conspiracy.

On February 17, 2016, the defendants, in response, filed an application for a prejudgment remedy and a counterclaim against the plaintiff alleging, among other things, that the plaintiff is liable to the defendants for breach of contract and is not entitled to any portion of the UBS litigation proceeds. In particular, the defendants alleged that the November, 2011 letter from Reed Smith to DLA Piper referencing the plaintiff's communication with the Schneider Group, as well as the commencement of the 2013 New York action, had breached certain provisions of both the CSA and the LPA. The defendants' operative amended counterclaim, dated June 7, 2016, contained two counts that respectively alleged breach of the CSA and fraud.

On May 17, 2016, the defendants filed a motion to strike all seven counts of the plaintiff's complaint. The defendants argued in their memorandum of law in support, in relevant part, that counts five and six of the complaint, which alleged Connecticut statutory causes of action sounding in statutory theft and CUTPA, are barred by the choice of law provision in § 12 of the CSA, which provided that "[a]ny disputes or litigation arising out of this [a]greement shall be governed by New York law." On June 8, 2016, the plaintiff filed a memorandum of law in opposition to the defendants' motion to strike in which it argued, among other things, that the choice of law provision was not broad enough to preclude the Connecticut statutory causes of action.

On June 16, 2016, after an eight day hearing,[13] the court issued a thorough memorandum of decision in which it concurrently granted the plaintiff's application for a prejudgment remedy and denied the defendants' application for a prejudgment remedy. The court found that there was "probable cause that the plaintiff will obtain a judgment in the amount of $4,929,582 plus interest in the amount of $492,000, for a total prejudgment remedy in the amount of $5,421,582." The defendants then filed a motion for reconsideration, and certain defendants also filed a motion to modify the prejudgment remedy, which were both summarily denied by the court. The plaintiff thereafter secured the full attachment amount.

On June 20, 2016, the court issued an oral ruling granting the defendants' motion to strike as to counts five and six, and denying the motion as to the remainder of the counts. The court held that although the choice of law provision in § 12 of the CSA "is not quite as broad" as compared to other similar cases, "it is still quite broad. It is difficult to see how the specific claims alleged in counts five and six being litigated in this case do not arise out of the [CSA]. Those counts have as the center of the alleged wrongful conduct of the defendants various wrongful [conduct] and schemes that would further their efforts to withhold from the [plaintiff] the amount the [plaintiff] claim[s] [is] due under

the CSA. As such, while those counts do not rest on the validity, construction, and enforcement of the agreement, they do arise out of the obligations of the defendants that emanate from that agreement."

On October 14, 2016, after seven additional days of evidence, the court issued an extensive memorandum of decision in which it rendered judgment partially in favor of the plaintiff as to certain defendants on its complaint and in favor of the plaintiff on the defendants' counterclaim.[14] In particular, the court concluded that the defendants that were parties to the CSA—PCM, POF, PIM, Schepis, and Canelas—as well as the general partner of PCM at the time the UBS litigation proceeds were realized, Northeast, were liable for breach of contract and breach of the covenant of good faith and fair dealing for their intentional failure to remit to the plaintiff its proportionate share of the UBS litigation proceeds as secured by the CSA. The court also concluded that the remaining claims in the plaintiff's complaint, the defendants' special defenses, and the defendants' counterclaim had not been proven. Consequently, the court rendered judgment in favor of the plaintiff against PCM, POF, PIM, Schepis, Canelas, and Northeast in the total amount of "$4,929,582 plus prejudgment interest at the rate of 10 percent per year from October 16, 2015, the date that the plaintiff's interest in the UBS [litigation] proceeds should have been remitted to the plaintiff, until October 16, 2016, in the amount of $492,958, for a total of $5,422,540." The court also rendered judgment in favor of Pursuit Partners, PCM Master, and POF Master on counts one and two of the complaint, in favor of all the defendants on counts three through seven of the complaint, and in favor of the plaintiff on the counterclaim. This appeal and cross appeal followed.

On November 8, 2016, during the pendency of this appeal, the plaintiff, pursuant to General Statutes § 52-278k, filed a motion with the trial court seeking modification of the previously secured prejudgment remedy attachment amount to secure from PCM, POF, PIM, Schepis, Canelas, and Northeast an additional $947,731 that it anticipated would accrue during the pendency of this appeal. On the same date, the plaintiff, pursuant to Practice Book § 13-13, filed a motion with the trial court seeking supplemental asset disclosure from those defendants to assist with the securing of the additional attachment pursued by the motion to modify. On December 16, 2016, the defendants filed an opposition to the plaintiff's motion to increase the prejudgment remedy in which they argued, among other things, that § 52-278k does not permit the upward modification of a prejudgment remedy in the present circumstances.

On January 4, 2017, after a hearing, the court granted the plaintiff's motion to increase the prejudgment remedy amount by $947,731 to a total of $6,369,313, holding

that § 52-278k permits the modification of a prejudgment remedy " 'at any time,' " and that the "evidence at trial and the circumstances of the pending appeal" constituted probable cause warranting an increased modification. On the same date, the court granted the plaintiff's motion for disclosure of assets to assist with the securing of the additional amount. The defendants thereafter filed an amended appeal to challenge these rulings. Additional facts will be set forth as necessary.

On appeal, the defendants present a myriad of claims, which principally challenge the court's interpretation of the CSA and the LPA. In particular, the defendants argue that the court improperly determined that certain defendants breached the CSA and the covenant of good faith and fair dealing, improperly rejected their breach of contract counterclaim, improperly held all of the defendants that had signed the CSA liable for the breach found by the court of a single provision thereof, and improperly determined the amount of damages. The defendants also claim that the court improperly granted the plaintiff's motion to increase the amount of the prejudgment remedy and the plaintiff's motion for discovery to assist it with securing the additional prejudgment remedy attachment. In its cross appeal, the plaintiff claims that the court improperly determined that the defendants that had not signed the CSA were not liable, improperly granted the defendants' motion to strike its Connecticut statutory causes of action, improperly determined that the plaintiff could not prevail on its conversion claim, and improperly determined the amount of damages. We now turn to each of the parties' claims.

I

The defendants first claim that the court improperly interpreted the agreements between the parties when it concluded that the plaintiff prevailed on its breach of contract claim, which alleged that the defendants had failed to pay the plaintiff its proportionate share of the proceeds from the UBS litigation. The defendants first argue that none of them could be held liable for breach of the CSA because the distribution of the proceeds from the contingent assets was governed by the LPA, which they contend afforded the general partner discretion to withhold or reduce payment of the contingent interests. They argue that the court misinterpreted the agreements to obligate them to remit the proceeds of the contingent assets to the plaintiff as soon as practicable. We disagree.

We begin by setting forth the standard of review and legal principles relevant to this claim. "The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact [subject to the clearly erroneous standard of review] . . . [when] there is definitive

contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 575, 119 A.3d 570 (2015). In light of the fact that the defendants' claim is directed at the court's interpretation of the agreements, as opposed to the court's factual findings, "our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Sun Val, LLC* v. *Commissioner of Transportation*, 330 Conn. 316, 325–26, 193 A.3d 1192 (2018).

In interpreting contracts pursuant to New York law,[15] "the intention of the parties should control. To discern the parties' intentions, the court should construe the agreements so as to give full meaning and effect to the material provisions . . . ." (Citations omitted.) *Excess Ins. Co. Ltd.* v. *Factory Mutual Ins. Co.*, 3 N.Y.3d 577, 582, 822 N.E.2d 768, 789 N.Y.S.2d 461 (2004). "Where . . . a literal construction defeats and contravenes the purpose of the agreement, it should not be so construed . . . ." (Citation omitted; internal quotation marks omitted.) *Currier, McCabe & Associates, Inc.* v. *Maher*, 75 App. Div. 3d 889, 892, 906 N.Y.S.2d 129 (2010). "In making these determinations, [t]he court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought . . . ." (Citations omitted; internal quotation marks omitted.) Id., 890–91.[16]

We begin our analysis with the plain language of the provision at issue. Section 4 of the CSA provided in relevant part: "PCM owns certain contingent assets that were valued at zero . . . for purposes of calculating PCM's NAV. These contingent assets include (a) PCM's proportionate interest in the UBS [l]itigation; and (b) PCM's interest in [the LBIE claim]. Nothing herein . . . shall affect in any way [the plaintiff's] pro rata share . . . of the contingent assets as of February 28, 2011. It is further understood that [the plaintiff's] continued interest in the contingent assets shall be governed by the [LPA] . . . ."

The definitive language of this section demonstrates that the parties intended to preserve the plaintiff's then existing right to receive its share of proceeds that might be realized from certain contingent assets. Prior to the execution of the CSA, these contingent assets were the property of PCM, and, thus, at the time the CSA was executed, the parties carved out these contingent assets

from the redemption payment and agreed that the plaintiff would be entitled to its share of these assets if they were realized.

There is no dispute among the parties regarding the foregoing interpretation; rather, the parties' views diverge as to the intended meaning of the final relevant sentence of § 4 of the CSA, which directs that the LPA governs the continued interest in the contingent assets. The defendants argue that the parties intended that *all* of the provisions of the LPA continued to govern the contingent interests. They maintain that the contingent interests were subject to the distribution and withdrawal provisions of the LPA, which they argue granted the general partner of PCM broad discretion to reduce, reinvest, or retain a portion of the contingent assets once realized. The plaintiff argues that, because the execution of the CSA constituted a withdrawal of the plaintiff from PCM, the court properly determined that the parties intended that the payment of the contingent assets was to be governed by a specific portion of the LPA withdrawal provision. We agree with the plaintiff.

In the present case, the court properly considered the language of § 4 of the CSA in conjunction with the other provisions of the CSA, the LPA, the relation of the parties, and the circumstances under which it was executed. The court first determined that the execution of the CSA had the effect of withdrawing the plaintiff as a limited partner from PCM. The court then determined that, because the plaintiff had been withdrawn from PCM, the parties intended that the payment of the contingent assets secured by the CSA was to be governed by § 5.01 (c) of the LPA, which mandated that "[a] withdrawal shall be effective on the applicable [w]ithdrawal [d]ate. In the case of any [l]imited [p]artner who withdraws all or any portion of its [l]imited [p]artnership [i]nterest, such withdrawing [l]imited [p]artner shall be paid the amount of its withdrawal in cash as soon as practicable following the effective date of the withdrawal, subject to certain restrictions and reserves for contingent or undetermined liabilities of [PCM]." We conclude that the court's interpretation is legally and logically correct and supported by the facts in the record.

The purpose of the CSA, as a whole, was to resolve the then existing disputes between the parties, and the execution of the CSA had the effect of vitiating any remaining investment the plaintiff had in PCM. The CSA provided that, in exchange for the releases of claims, PIM was to pay the plaintiff a settlement payment, as well as a redemption payment, which represented the plaintiff's pro rata share of the NAV remaining in PCM at that time. Thus, the only financial connections between the plaintiff and PCM that existed after the execution of the CSA were the certain holdbacks and the contingent interests. The limited nature of the ongo-

ing relationship was confirmed by PIM's letter to the other investors in PCM, sent twenty days after the CSA was executed, informing the investors that the plaintiff's claims had been settled and that the plaintiff had been mandatorily withdrawn as a limited partner in PCM. Consequently, although the CSA did not expressly state that the plaintiff had been withdrawn from PCM, these facts support the court's determination that the execution of the CSA constituted a withdrawal of the plaintiff from PCM. Thus, in light of this withdrawal, it was logical for the court to conclude that the contingent assets were to be governed by the specific withdrawal provision of § 5.01 (c) of the LPA.[17]

The court's interpretation of both the CSA and the LPA together[18] is further bolstered by the relevant portion of § 5.01 (c) of the LPA that provides that a withdrawal was "subject to certain restrictions and reserves for contingent or undetermined liabilities of [PCM]." The parties specifically identified these restrictions and reserves in the CSA holdback provisions, pursuant to which $250,000 was subtracted from the plaintiff's redemption payment "for the purpose of funding necessary costs . . . associated with the ongoing [UBS litigation] . . . ." As a result, it is apparent that the parties anticipated that further expenditure was required to pursue the contingent assets, and, thus, they specifically assented to the potential reduction of that amount in the CSA. This reduction is in conformance with the foregoing language of the LPA.

The fatal problem with the defendants' proffered interpretation is that it fails to consider the pertinent language of the CSA in conjunction with the LPA and the circumstances in which the CSA was executed. The court properly determined that the defendants' position is untenable because, in view of the fact that the plaintiff no longer was a limited partner in PCM, it would contravene the purpose of the CSA to permit the defendants to retain or reinvest the contingent assets once they were realized. We agree that it would be illogical to conclude that, after the withdrawal of the entire NAV of the plaintiff's investment, the realization of the contingent assets would constitute a reinvestment of the plaintiff back into PCM, and the defendants could then utilize those funds however they wished. This myopic interpretation contravenes the purposes of the CSA. Instead, it was logical for the court to conclude that, following PCM's receipt of proceeds from the realization of a contingent asset, the plaintiff, pursuant to § 4 of the CSA and § 5.01 (c) of the LPA, was entitled to its pro rata share of those proceeds "in cash as soon as practicable following the effective date of the withdrawal . . . ." Accordingly, we conclude that the court's interpretation was logically and legally correct and was supported by the facts in the record.

Consequently, we conclude that the court properly

held that the plaintiff proved a breach of contract because it is uncontroverted that the defendants settled the UBS litigation for $36 million, and the plaintiff has not received its portion of those proceeds in contravention of the CSA and the LPA.

## II

The defendants next claim that the court improperly rejected their breach of contract counterclaim, which alleged that they were relieved of their obligation to remit the UBS litigation proceeds because the plaintiff had breached the CSA. The defendants argue that the court erroneously found that (1) the plaintiff had not materially breached the CSA, and (2) the defendants' prior partial delayed payment of the LBIE claim to the plaintiff relieved the plaintiff from its obligations under the confidentiality provision. We disagree.

We begin by setting forth the standard of review and legal principles relevant to this claim. "The determination of whether a contract has been materially breached is a question of fact that is subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Efthimiou* v. *Smith*, 268 Conn. 487, 493–94, 846 A.2d 216 (2004).

Under New York law, "[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage . . . ." (Citation omitted; internal quotation marks omitted.) *Clearmont Property, LLC* v. *Eisner*, 58 App. Div. 3d 1052, 1055, 872 N.Y.S.2d 725 (2009). A party's prior material breach relieves the nonbreaching party from performing its remaining obligations under the contract. *U.W. Marx, Inc.* v. *Koko Contracting, Inc.*, 124 App. Div. 3d 1121, 1122, 2 N.Y.S.3d 276, appeal denied, 25 N.Y.3d 904, 30 N.E.3d 167, 7 N.Y.S.3d 276 (2015); *N450JE, LLC* v. *Priority 1 Aviation, Inc.*, 102 App. Div. 3d 631, 632, 959 N.Y.S.2d 156 (2013).

"[A] 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. In other words, for a breach of contract to be material, it must 'go to the root' or 'essence' of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract, or affect the purpose of the contract in an important or vital way. A breach is

'material' if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract. Other courts have defined a breach of contract as 'material' if the promisee receives something substantially less or different from that for which the promisee bargained. In many cases, a material breach of contract is proved by the established amount of the monetary damages flowing from the breach; however, proof of a specific amount of monetary damages is not required when the evidence establishes that the breach was so central to the parties' agreement that it defeated the essential purpose of the contract. Conversely, where a breach causes no damages or prejudice to the other party, it may be deemed not to be 'material.' " (Footnotes omitted.) 23 R. Lord, Williston on Contracts (4th Ed. 2018) § 63:3, pp. 482–84; see *Robert Cohn Associates, Inc.* v. *Kosich*, 63 App. Div. 3d 1388, 1389, 881 N.Y.S.2d 235 (2009) ("a party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract" [internal quotation marks omitted]); *Metropolitan National Bank* v. *Adelphi Academy*, Docket No. 7389/08, 2009 N.Y. Misc. LEXIS 1261, *10 (N.Y. Sup. May 27, 2009) (decision without published opinion, 886 N.Y.S.2d 68 [N.Y. Sup. 2009]) ("for a breach to be material it must be so substantial that it defeats the object of the parties in making the contract; the breach must go to the root of the agreement between the parties").

Section 7 of the CSA was a confidentiality provision in which the parties agreed, among other things, "to maintain in the strictest confidence and not disclose . . . the contents and terms of [the CSA] . . . [and] not to use or provide any information relating to any claim arising out of an investment in the [f]unds to any other person in connection with the initiation of any lawsuit, claim, arbitration or action related to or concerning any investment in PCM, POF or any other investment vehicle managed by PIM." There is no dispute among the parties with respect to the interpretation of this provision.

A

The defendants first argue that the court erroneously found that the plaintiff had not materially breached the CSA[19] by violating § 7 when it requested that Reed Smith contact the SEC regarding the investigation, commenced the 2013 New York action seeking an injunction to prevent PCM from utilizing the UBS litigation holdback, and colluded with the Schneider Group. We conclude that the court's finding was not clearly erroneous.

In the present case, as indicated previously in this

opinion, the purpose of the CSA was to settle and resolve the disputes among the parties. At the outset of the CSA, it is acknowledged that the parties "wish[ed] to resolve any and all disputes . . . between them," and that the "sole purposes" of the CSA were to end "the [2010] New York [a]ction and the [a]rbitration . . . ." The objective of the CSA, therefore, was the resolution of the pending claims, which entailed the plaintiff's withdrawal and release of claims and the defendants' distribution of certain payments to the plaintiff. Thus, the court's finding that the plaintiff's actions did not constitute a material breach of the CSA is supported by the evidence that § 7 was not central to the CSA.

Moreover, the court's finding is supported by the evidence regarding the circumstances in which these communications were made. Philip Chapman, the managing member of the general partner of the plaintiff, testified that the then ongoing SEC investigation was viewed as an impediment to the return of the plaintiff's holdbacks, and that the communications were intended to stop the legal fees from draining those holdbacks. Thus, the plaintiff's communications to the SEC were made regarding an ongoing investigation in which the plaintiff's interests were potentially involved. Further, there was evidence presented that the 2013 New York action was filed by the plaintiff to obtain an accounting and an injunction that would enjoin the defendants from accessing or utilizing the plaintiff's holdbacks, which were secured by the CSA, because the defendants had failed to provide the plaintiff with periodic updates as required by the CSA. Essentially, the plaintiff commenced the 2013 New York action in response to the defendants' purported breaches of the CSA. In addition, there was evidence that PIM, prior to the November 16, 2011 letter from Reed Smith, already had disclosed to PCM's investors, including the Schneider Group, that the claims brought by the plaintiff against PCM had been resolved by the CSA.

This evidence supports the court's findings that the plaintiff, by engaging in these communications, did not materially breach the essential purpose of the CSA, which was to resolve the then existing disputes among the parties. The evidence that the plaintiff sought information from the SEC regarding an investigation that may affect the plaintiff's interest, filed an action that alleged that the defendants had breached the CSA, and communicated with the Schneider Group after it already had been advised of the CSA supports the court's finding. In fact, each of these actions were taken to enforce the plaintiff's rights that were at the core of the CSA. The defendants' argument would lead to the absurd result that the defendants could act contrary to the CSA and the plaintiff could do nothing about it because disclosing the defendants' actions would violate the CSA's confidentiality provision. The court was

not required to conclude that the parties intended such an outcome. See *Davis* v. *Nyack Hospital*, 130 App. Div. 3d 455, 455–56, 13 N.Y.S.3d 371 (2015) (party permitted to disclose terms of confidential settlement agreement in order to enforce agreement); *Osowski* v. *AMEC Construction Management, Inc.*, 69 App. Div. 3d 99, 106, 887 N.Y.S.2d 11 (2009) ("disclosure of the terms of a settlement agreement by a settling party to a nonsettling party may be appropriate, despite the presence of a confidentiality clause in the agreement, where the terms of the agreement are 'material and necessary' to the nonsettling party's case"). Consequently, we conclude that the court's finding that the plaintiff had not materially breached the CSA was not clearly erroneous.

B

We now turn to the defendants' second claim that the court erroneously found that the defendants' prior partial delayed payment of the LBIE claim to the plaintiff relieved the plaintiff from its obligations under the confidentiality provision.[20] The defendants reassert their argument, which we rejected in part I of this opinion, that the payment of the LBIE claim proceeds, as a contingent asset, was subject to reduction and reinvestment pursuant to the LPA.[21] Although we need not reach this issue given our conclusion in part II A of this opinion that the plaintiff's disclosures did not constitute a material breach of the CSA, we, nonetheless, conclude that the court's finding that any claimed breach by the plaintiff was excused by the defendants' prior breach of the CSA was not clearly erroneous.

In the present case, there was an abundance of evidence to support the court's finding. First, the language of the agreements, as outlined previously in part I of this opinion, supports the court's conclusion that the CSA, read in conjunction with the LPA, obligated the payment of the contingent assets, including the pro rata share of the proceeds of the LBIE claim, to the plaintiff "in cash as soon as practicable following the effective date of the withdrawal . . . ." As the contingent assets could not have been remitted on the date of the execution of the CSA because they had not yet been realized, "as soon as practicable following the effective date of the withdrawal," effectively was the date on which the proceeds from the LBIE claim were received by PCM. Here, shortly after the CSA was signed, the LBIE claim was sold for $9,334,141.55, and, on June 1, 2011, those funds were received in PCM Master's account. Accordingly, the plaintiff was entitled to receive its pro rata share of those proceeds; see footnote 9 of this opinion; approximately $2,994,729.76, as soon as practicable after June 1, 2011.

Nevertheless, the evidence demonstrated that no portion of the LBIE claim proceeds were remitted to the plaintiff until October, 2011, when the plaintiff received

$1,022,022.36. In response to requests from Reed Smith as to the valuation of this amount, DLA Piper stated that it had calculated that the plaintiff's share of the LBIE claim was worth $2,132,559, which amount represented 32.08 percent of PCM's 90 percent interest in the LBIE claim owned by PCM Master, minus a performance fee. Neither of DLA Piper's communications, however, provided an explanation as to the basis for the reduction for the performance fee or the balance reserve, nor the reason for which the defendants had remitted less than 48 percent of the total amount that they had calculated the plaintiff's interest in the LBIE claim to be worth. Two years later, shortly after the commencement of the 2013 New York action, the plaintiff received the second and final partial distribution of approximately $700,000 in additional proceeds from the LBIE claim, for a total distribution of $1,722,022.36, which was approximately 81 percent of the total amount that the defendants had calculated the plaintiff's interest in the LBIE claim to be worth.

The foregoing evidence supports the court's finding that the defendants were in material breach of their obligations under the CSA in October and November, 2011, which was prior to any of the plaintiff's aforementioned communications. Even if we assume that the defendants' calculation as to the plaintiff's proportionate share of the LBIE claim was correct, the evidence that, prior to any of the contested communications, the plaintiff received less than one half of what the defendants had calculated was the plaintiff's entitlement, more than four months after the funds had been received by PCM without sufficient justification, supports the court's finding that the defendants had materially breached the CSA. On the basis of the foregoing, we conclude that the court's finding that the defendants materially had breached the CSA prior to the plaintiff's purported breach was not clearly erroneous. Therefore, we conclude that the court properly rejected the defendants' breach of contract counterclaim.

### III

The defendants also claim that the court improperly concluded that the plaintiff prevailed on its breach of the implied covenant of good faith and fair dealing claim. In support, the defendants reassert their argument, which we rejected in parts I and II of this opinion, that neither the LPA nor the CSA mandate that they remit the entirety of the plaintiff's proportionate share of the UBS litigation proceeds. They argue that, in the absence of such a mandate, the court erroneously found them liable for breach of the implied covenant of good faith and fair dealing.[22] We disagree.

We begin by setting forth the standard of review and legal principles relevant to this claim. The question of whether certain conduct breached the duty of good faith and fair dealing is a question of fact subject to the

clearly erroneous standard of review. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007); see also *Landry* v. *Spitz*, 102 Conn. App. 34, 47, 925 A.2d 334 (2007).

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. . . . This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . . . Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion . . . . The implied covenant of good faith and fair dealing is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement . . . . The implied covenant of good faith encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the agreement, and prohibits either party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." (Citations omitted; internal quotation marks omitted.) *Atlas Elevator Corp.* v. *United Elevator Group, Inc.*, 77 App. Div. 3d 859, 861, 910 N.Y.S.2d 476 (2010).

In the present case, the court found that the signatory defendants, PIM, POF, PCM, Schepis, and Canelas, deprived the plaintiff of its right to receive the benefits under the CSA. In particular, the court found: "The signatory defendants had a clear obligation under the CSA to provide the plaintiff with 32.08 percent of PCM's interest in the UBS [Litigation] proceeds as soon as practicable after receipt. The defendants have done everything but that. The defendants have conducted themselves in a manner in which they have wilfully attempted to thwart the plaintiff's ability to receive the benefits of the CSA. Rather than provide the plaintiff with 32.08 percent of PCM's interest in the UBS [Litigation] proceeds, they have raised claims and counterclaims that arise out of alleged conduct of the plaintiff, which conduct was justified based upon their prior breaches of the CSA with regard . . . to the LBIE [claim] proceeds. At every step of the process, the defendants have conducted themselves not in a way to provide the plaintiff with [its] contractual benefit, but rather to maintain control, use, and possession of as much of the mon[eys] that the plaintiff had a contractual right to for as long as possible in order to maintain the benefit of those mon[eys] for themselves. Accordingly, the court finds that the signatory defendants are all liable for the breach of the covenant of good faith and fair dealing contained in the CSA. Indeed, it is remark-

able that [al]though the plaintiff executed the CSA with the intent of resolving its issues and ending litigation and disputes with the defendants, the defendants' wilful conduct in failing to comply with the CSA has been the primary reason for the continued litigation and excessive expenses incurred by the parties since 2011. The defendants' failure to provide information to the plaintiff until ordered by the court, which might have resolved some of the issues in advance of the litigation, is indicative of their breach of this covenant. The nonsignatory defendants, not having a contractual obligation to the plaintiff, can have no liability under the covenant implied by that contractual relationship.''

We conclude that these subsidiary factual findings support the court's finding that at least some of the defendants breached the implied covenant of good faith and fair dealing. At the outset, we reject, for the reasons outlined in parts I and II of this opinion, the defendants' contention that they had no obligation under the CSA to remit the UBS litigation proceeds to the plaintiff. Consequently, the court's findings that the defendants failed to remit those proceeds, wilfully attempted to thwart the plaintiff's ability to receive those proceeds, raised unsupported claims and counterclaims that alleged misconduct by the plaintiff, maintained control over the proceeds so as to retain them as long as possible for their own benefit, continued to prolong the litigation and cause excessive expenses, and failed, until ordered by the trial court, to provide information to the plaintiff that could have resolved some of the issues in advance of this litigation, all support the court's finding. Therefore, we conclude that the court properly concluded that the plaintiff prevailed on its implied covenant of good faith and fair dealing claim.

IV

Because it relates to the extent of the defendants' liability, we next address the plaintiff's claim in its cross appeal that the court improperly concluded that the plaintiff could not prevail on its conversion claim. The defendants argue that the court properly concluded that a breach of contract claim, alone, cannot support a claim for conversion. The plaintiff argues that the UBS litigation proceeds were a specifically identifiable thing controlled by the plaintiff. We conclude that the court properly concluded that the plaintiff could not prevail on its conversion claim because it merely was a recasting of its breach of contract claim.

We begin by setting forth the standard of review and legal principles relevant to this claim. This claim requires us to interpret the plaintiff's pleadings, which is a question of law subject to plenary review. See *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 462, 102 A.3d 32 (2014). Under New York law,[23] ''[i]n order to succeed on a cause of action to recover damages for conversion, a plaintiff must show

(1) legal ownership or an immediate right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's right . . . ." (Citations omitted.) *Giardini* v. *Settanni*, 159 App. Div. 3d 874, 875, 70 N.Y.S.3d 57 (2018). "The mere right to payment cannot be the basis for a cause of action alleging conversion . . . ." (Citations omitted; internal quotation marks omitted.) *Zendler Construction Co.* v. *First Adjustment Group, Inc.*, 59 App. Div. 3d 439, 440, 873 N.Y.S.2d 134 (2009).

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated . . . . Put another way, where the damages alleged were clearly within the contemplation of the written agreement . . . [m]erely charging a breach of a duty of due care, employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim . . . ." (Citations omitted; internal quotation marks omitted.) *Dormitory Authority* v. *Samson Construction Co.*, 30 N.Y.3d 704, 711, 94 N.E.3d 456, 70 N.Y.S.3d 893 (2018).

"To determine whether a tort claim lies, we have also evaluated the nature of the injury, how the injury occurred and the harm it caused . . . . However, we have made clear that where [the] plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory . . . ." (Citations omitted; internal quotation marks omitted.) Id. "Generally, a tort cause of action that is based upon the same facts underlying a contract claim will be dismissed as a mere duplication of the contract cause of action . . . particularly where . . . both seek identical damages . . . ." (Citations omitted.) *Duane Reade* v. *SL Green Operating Partnership, L.P.*, 30 App. Div. 3d 189, 190, 817 N.Y.S.2d 230 (2006).

"While a cause of action alleging conversion cannot be predicated upon a mere breach of contract, the contracting party may also be held liable in tort where the conduct which constitutes a breach of contract also constitutes a breach of a duty distinct from, or independent of, the breach of contract . . . ." (Citations omitted.) *Connecticut New York Lighting Co.* v. *Manos Business Management Co.*, 171 App. Div. 3d 698, 699, 98 N.Y.S.3d 101 (2019); see *New York* v. *Shellbank Restaurant Corp.*, 169 App. Div. 3d 581, 582, 95 N.Y.S.3d 60 (conversion claim duplicative of breach of contract claim because "there were no facts pleaded beyond those that support the contract claim or that would support the existence of a duty separate from the parties' agreement"), appeal dismissed, 33 N.Y.3d 1061, 127 N.E.3d 312, 103 N.Y.S.3d 354 (2019); *Greater Bright Light Home Care Services, Inc.* v. *Jeffries-El*, 151 App. Div. 3d 818, 824, 58 N.Y.S.3d 68 (2017) ("cause of action

alleging conversion cannot be predicated on a mere breach of contract" [internal quotation marks omitted]).

In count four of its complaint, the plaintiff incorporated the prior three counts, including the breach of contract count, and alleged, in one paragraph, that the defendants engaged in conversion because "[the plaintiff], being the owner and entitled to the possession and payment of its share of the settlement funds from the UBS litigation and the sums advanced by [the plaintiff] in connection with the UBS litigation, made demand for payment of the sums to which it is entitled, and the defendants . . . including . . . Schepis and Canelas, have refused and neglected to return and pay over to [the plaintiff] the sums to which it is entitled and, without authority from [the plaintiff], converted the same to their own use." The court rejected the plaintiff's conversion claim and rendered judgment on that count in favor of the defendants because, in relevant part: "The plaintiff had a contractual right to be paid certain sums of money pursuant to the CSA. It had neither ownership nor possession of the money itself. . . . Here, the property was neither specific nor did the plaintiff have possession or control of the settlement of proceeds prior to the defendants' conduct. The plaintiff has ple[aded] and proven a breach of contract claim; without more, that claim does not establish conversion." (Citations omitted.)

We need not decide whether the court properly determined that the plaintiff failed to prove conversion on the basis that the UBS litigation proceeds were a specifically identifiable interest because we agree with the court that the plaintiff's conversion claim is merely a recasting of its breach of contract claim. The plaintiff's conversion claim seeks the same damages as the breach of contract claim, namely, its proportionate share of the UBS litigation proceeds. The plaintiff's conversion claim also alleges the same breach of duty, essentially, the defendants' obligation pursuant to the CSA and the LPA to remit the UBS litigation proceeds to the plaintiff. Accordingly, the plaintiff seeks to enforce the mandates of the CSA and the LPA that the defendants remit its share of the UBS litigation proceeds. In addition, the plaintiff's conversion claim is based on the exact allegations as its breach of contract claim because the plaintiff's complaint entirely incorporates the breach of contract allegations into its count alleging conversion. Indeed, on appeal, the plaintiff does not dispute the court's holding that its conversion claim was simply a breach of contract claim. Therefore, we conclude that the court properly determined that the plaintiff could not prevail on its conversion claim.

V

The plaintiff also claims that the court improperly granted the defendants' motion to strike its Connecticut statutory causes of action on the ground that those

claims are barred by § 12 of the CSA, which provides in relevant part that "[a]ny disputes or litigation arising out of this [a]greement shall be governed by New York law." The plaintiff argues that the court improperly interpreted the plain language of § 12 of the CSA to conclude that New York law applies so as to bar its Connecticut statutory causes of action.[24] We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. On May 17, 2016, the defendants filed a motion to strike all seven counts of the plaintiff's complaint. The defendants argued in their memorandum of law in support, in relevant part, that counts five and six of the complaint, which alleged Connecticut statutory causes of action sounding in statutory theft and CUTPA, are barred by the choice of law provision in § 12 of the CSA, which provides in relevant part: "Any disputes or litigation arising out of this [a]greement shall be governed by New York law." On June 8, 2016, the plaintiff filed a memorandum of law in opposition to the defendants' motion to strike in which it argued that the choice of law provision was not broad enough to preclude the Connecticut statutory causes of action.

On June 20, 2016, a hearing was held on the defendants' motion to strike, at which the parties advanced arguments consistent with their written memoranda. At the conclusion of the hearing, the court issued an oral ruling granting the defendants' motion to strike as to counts five and six, and denying the motion as to the remainder of the counts. The court compared and contrasted several decisions cited by the parties and concluded that although § 12 of the CSA, the choice of law provision "is not quite as broad" as compared to other similar cases, "it is still quite broad. It is difficult to see how the specific claims alleged in counts five and six being litigated in this case do not arise out of the [CSA]. Those counts have as the center of the alleged wrongful conduct of the defendants various wrongful [conduct] and schemes that would further their efforts to withhold from the [plaintiff] the amount the [plaintiff] claim[s] [is] due under the CSA. As such, while those counts do not rest on the validity, construction, and enforcement of the agreement, they do arise out of the obligations of the defendants that emanate from that agreement. Sophisticated parties advised by sophisticated counsel chose to have all such disputes governed by New York law." The court, thus, determined that the plaintiff could not bring Connecticut statutory actions against the defendants because, pursuant to § 12 of the CSA, New York law applied to the dispute among the parties.

We next set forth the standard of review and legal principles relevant to this claim. We afford plenary review to this claim because it stems from the court's decision granting a motion to strike; *Levin* v. *State*, 329

Conn. 701, 706, 189 A.3d 572 (2018); and requires us to interpret definitive contract language; see *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 575. We incorporate the New York principles of contract interpretation as outlined in part I of this opinion.[25]

Pursuant to New York law, the applicability of a choice of law clause to a particular claim is entirely dependent on the exact language of the clause and the nature of the claim. For instance, "[u]nder New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract . . . ." (Citation omitted; internal quotation marks omitted.) *Coco Investments, LLC* v. *Zamir Manager River Terrace, LLC*, Docket No. 600137-2008, 2010 WL 761237, *5 n.1 (N.Y. Sup. March 3, 2010) (decision without published opinion, 907 N.Y.S.2d 99 [N.Y. Sup. 2010]); see, e.g., *Twinlab Corp.* v. *Paulson*, 283 App. Div. 2d 570, 571, 724 N.Y.S.2d 496 (2001) (choice of law clause applicable to "validity, interpretation, construction and performance" of consulting agreement did not apply to "tort cause of action [that] was based on the appellant's alleged criminal activities, which were unrelated to his duties as a consultant" [internal quotation marks omitted]).

On the other hand, "the use of 'arising out of' language in a contract is considered unambiguous and viewed as reasonably supporting only a broad reading. For example, in the arbitration context, the language 'arising out of' a specified contract is considered 'broadly worded, and hence, encompasses [a plaintiff's] claims of fraudulent inducement directed at the agreement itself.' " *Nycal Corp.* v. *Inoco PLC*, Docket No. 98-7058, 1998 WL 870192, *2 (2d Cir. December 9, 1998) (decision without published opinion, 166 F.3d 1201 [2d Cir. 1998]). "The same analysis of the phrase 'arising out of' is found in insurance law cases." Id., *3; see, e.g., *Turtur* v. *Rothschild Registry International, Inc.*, 26 F.3d 304, 309–10 (2d Cir. 1994) (choice of law clause applicable to "any controversy or claim arising out of or relating to this contract or breach thereof" was "sufficiently broad to cover tort claims as well as contract claims" [emphasis omitted]); *Capital Z Financial Services Fund II, L.P.* v. *Health Net, Inc.*, 43 App. Div. 3d 100, 105, 109, 840 N.Y.S.2d 16 (2007) (choice of law clause applicable to " 'all issues' concerning 'enforcement of the rights and duties of the parties' " was broad enough to cover tort claims).

In count five of its complaint, the plaintiff alleged, among other things, that the CSA secured its legal ownership in the proceeds of the UBS litigation and that the defendants, without any valid basis, permanently deprived the plaintiff of those proceeds. The plaintiff further alleged that the defendants used the UBS litigation proceeds for themselves and, thus, the defendants'

conduct constituted theft under Connecticut's statutory theft statute, § 52-564. In count six of its complaint, the plaintiff alleged that the defendants repeatedly breached the CSA, misappropriated the plaintiff's share of the UBS litigation proceeds, and commenced vexatious and frivolous litigation and arbitration against the plaintiff. The plaintiff alleged that the defendants' conduct constituted unfair and deceptive trade practices in violation of Connecticut's CUTPA statute, General Statutes § 42-110b (a).

We conclude that the relevant language of § 12 of the CSA that "[a]ny disputes or litigation arising out of this [a]greement shall be governed by New York law," barred the plaintiff's statutory theft and CUTPA causes of action. The language "[*a*]*ny disputes or litigation arising out of this* [*a*]*greement*" is broad. (Emphasis added.) The language of this section does not apply only to breach of contract causes of action, and we decline to read it to give it that effect. If the parties intended § 12 to apply only to a claim of breach of the CSA, they could have included such language. Instead, the parties agreed that New York law would apply to *any* disputes or litigation *arising* out of the CSA.

In the present case, the plaintiff's extracontractual statutory causes of action arise out of the CSA because the basis for both claims stems from the CSA. In count five, the plaintiff alleged that the defendants withheld and utilized for themselves the UBS litigation proceeds. In count six, the plaintiff alleged that the defendants breached the CSA and failed to provide the plaintiff its share of the UBS litigation proceeds. The foundation for both of these claims is the CSA and the defendants' failure to remit the plaintiff's share of the proceeds of the UBS litigation secured thereby. Accordingly, both of these counts constitute a dispute or litigation that arises from the CSA and, thus, are barred by the parties' agreement in § 12 of the CSA that New York law would apply to such claims. Therefore, we conclude that the court properly granted the defendants' motion to strike counts five and six of the plaintiff's complaint.

VI

Having addressed the court's conclusions as to the viability of each of the plaintiff's claims in its complaint that are challenged on appeal, we now turn to the question of which of the defendants are liable to the plaintiff for its claims of breach of contract and the implied covenant of good faith and fair dealing. The defendants claim that the court improperly interpreted the CSA to conclude that all of the defendants that were signatories to the CSA—PIM, POF, PCM, Schepis, and Canelas— were jointly and severally liable for nonpayment of the UBS litigation. The defendants argue that, because payment of the UBS litigation was governed by the LPA, not the CSA, only Northeast, as the general partner of PCM at the time the UBS litigation was resolved, had

the obligation to remit the UBS litigation. The plaintiff argues that the court's conclusion was proper, yet, in its cross appeal, it claims that all of the defendants should be held liable pursuant to a piercing the corporate veil or alter ego theory, and that the court improperly declined to consider these theories despite the fact that they had been pleaded and briefed. We reject the plaintiff's piercing and alter ego claims, and we agree with the defendants that the court improperly concluded that all of the defendant signatories to the CSA are liable. We, however, conclude that PIM, PCM, and Northeast are liable for the nonpayment of the UBS litigation proceeds.

A

The plaintiff claims that the court improperly declined to consider its piercing the corporate veil and alter ego theories. It argues that, if the court had considered these theories, it would have determined that all of the defendants were liable for nonpayment of the UBS litigation proceeds. We disagree with the plaintiff's interpretation of the trial court's judgment.

"The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Internal quotation marks omitted.) *Olson* v. *Mohammadu*, 310 Conn. 665, 682, 81 A.3d 215 (2013). "[A] trial court opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 782, 200 A.3d 1091 (2019) (*D'Auria, J.*, dissenting).

The following additional procedural history is relevant to this issue. In its complaint, the plaintiff alleged, in describing the relevant parties, that "[t]he defendant entities are all owned or controlled by the defendants Schepis and Canelas"; that "[a]ll of the defendant entities, and nonparty Pursuit Management, are part of the Pursuit Hedge Fund Group, a self-described 'unitary enterprise' under the exclusive control of two individuals . . . Schepis and Canelas"; that "[t]he Pursuit Hedge Fund Group includes Pursuit Partners and PIM—both of which are wholly owned and controlled by Schepis and Canelas"; that "[a]t all relevant times . . . Schepis and Canelas controlled and continue to control each of the corporate defendants, and Schepis and Canelas are alter egos of each of the entities they control"; that "Schepis and Canelas have stated in court filings, including in the UBS litigation, that the Pursuit entities operate as a 'unitary enterprise' and are oper-

ated as a single entity"; and that "[t]he structure of the Pursuit entities is completely integrated."

In its memorandum of decision in which it rendered judgment partially in favor of the plaintiff, the court held that "[t]he nonsignatory defendants, other than Northeast, cannot be held liable to the plaintiff for breach of a contract or an implied covenant in that contract to which they are not a party. Notably, the plaintiff did not plead a count against any of these defendants sounding in a piercing of the corporate veil or alter ego [theory]. The plaintiff seems to rely upon the finding by the court in the UBS litigation; [*Pursuit Partners, LLC* v. *UBS AG*, Superior Court, judicial district of Stamford-Norwalk, Complex Litigation Docket, Docket No. CV-08-4013452-S (July 3, 2014) (58 Conn. L. Rptr. 501)]; concerning the interrelationship and unitary nature of the various Pursuit hedge fund entities, but the determination of the court in its decision to reconsider its prior ruling dismissing the action was a determination that related to the standing of the plaintiff[s] [in that action]. Nothing in that decision implies or suggests that the same concepts are applicable or control the decision of whether or not nonsignatory defendants are liable for the conduct of the signatory defendants. Indeed, the standards discussed by the court in its memorandum of decision are quite foreign to the traditional standards applied in New York and Connecticut with regard to piercing a corporate veil." Nevertheless, the court utilized the plaintiff's unitary enterprise theory to conclude that all of the defendants that had signed the CSA were liable. The court held that "[t]he evidence is clear that all of the Pursuit entities were controlled by Schepis and Canelas in a variety of capacities. Indeed, in the UBS litigation, [the plaintiffs] took the position that the Pursuit entities were, and the UBS court found that, the various Pursuit entities constituted a 'unitary set of tightly related entities all working for a common purpose . . . .' [*Pursuit Partners, LLC* v. *UBS AG*, supra, 502]. The evidence before this court is consistent with that finding."

In the present case, construing the court's judgment as a whole, it is apparent that the court, although recognizing that the plaintiff had not separately pleaded these theories, had considered and rejected the plaintiff's piercing the corporate veil and alter ego theories. The court rejected the plaintiff's theories on the ground that the plaintiff's reliance on the holding of *Pursuit Partners, LLC* v. *UBS AG*, supra, 58 Conn. L. Rptr. 501, was inapposite. In that decision, the Superior Court, after reconsideration, vacated its prior dismissal of the UBS litigation and held that Pursuit Partners and PIM had standing to pursue a claim against the defendants in that action because the "unitary interest as described by [the testimony presented] concerning fees and percentages based upon the funds would support a colorable claim of direct injury to the plaintiff[s] in an individ-

ual or representative capacity." Id., 506. In the present case, the court determined that the issue of whether Pursuit Partners and PIM had standing to pursue an action against the defendants in the UBS litigation is distinct and does not provide a basis for an alter ego or piercing the corporate veil claim against the defendants who had not signed the CSA.

Although the court did not engage in a discussion of each and every element of the plaintiff's theories, as the plaintiff maintains it should have done, there is no question that it considered and rejected them. We recognize that "[t]rial court judges operate under tremendous time pressure and without the resources available to [our Supreme Court] and the Appellate Court." *In re Jacob W.*, supra, 330 Conn. 782 (*D'Auria, J.*, dissenting). This is especially true in cases, as in the present, which involve complicated factual scenarios and a multitude of legal theories asserted by both sides. Therefore, we conclude that the court had considered and rejected the plaintiff's piercing the corporate veil and alter ego theories.

B

The defendants claim that the court improperly interpreted the CSA to conclude that the defendants who were signatories to the CSA—PIM, POF, PCM, Schepis, and Canelas—as well as Northeast, as the successor general partner of PCM, were liable for nonpayment of the UBS litigation. They argue that, because payment of the UBS litigation was governed by the LPA, not the CSA, only Northeast had the obligation to remit the UBS litigation. We agree that the court's conclusion was incorrect, but disagree with the defendants that the proper interpretation of the LPA and CSA requires that only Northeast be held liable for nonpayment of the UBS litigation. For the following reasons, we conclude that PIM, PCM, and Northeast are liable for nonpayment of the UBS litigation.

We afford plenary review to this claim because it requires us to interpret definitive contract language; see *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 575; and we incorporate the New York principles of contract interpretation as outlined in part I of this opinion.

The trial court first observed that § 4 of the CSA,[26] which secured the contingent assets, "does not identify which of the parties to the agreement is obligated to make the payments required thereunder or in [any] way suggest the rights and obligations set forth in [§] 4 are rights and obligations that are in any way limited to less than all of the parties to the CSA." The court then relied on the language of an opening paragraph to the CSA, which provided: "NOW, THEREFORE, without admission of fault or liability and for the sole purposes of ending the New York [a]ction and the [a]rbitration

and resolving the claims that have been, or could have been, asserted between and among the [p]arties, and any other claims between them, in consideration of the mutual promises made herein, the sufficiency of which is hereby acknowledged, *the [p]arties hereby agree as follows* . . . ." (Emphasis added.)

The court then reasoned that "[a]ll of the parties understood the close working relationship between the entities and that Schepis and Canelas controlled all the entities. The CSA was executed as a way to settle claims brought in a lawsuit and arbitration proceedings against the individual parties to the CSA, which claims included claims brought against Schepis and Canelas personally. The court must conclude that all of the signatories were undertaking the obligation to protect and ultimately pay the plaintiff [its] interest in the contingent assets. Given the lack of a specific obligor in [§] 4, the interrelationship between the funds and the prior litigation/arbitration, the court concludes that the parties intended that all of the defendants be obliged to perform the various obligations contained therein. More importantly, that is what the express language of the CSA says. . . .

"All the parties made the mutual promises to each other, and the plaintiff was releasing all of the defendants for prior acts. It is simply an incorrect reading of the language 'the parties hereby agree' as suggesting that only some of the parties agree to the benefits and obligations contained therein, particularly when there is no specific language [in § 4][27] . . . that identifies a particular party who is to perform a particular obligation.

"While [§] 4 of the CSA identifies PCM, as it must, as the owner of the certain contingent assets, it does not limit the obligation to comply with the terms of the agreement to PCM. The parties were aware that PCM and the other Pursuit entities could only act with the consent of its general partner and, therefore, with the consent of Schepis and Canelas, who controlled and managed the general partner. In the absence of such an express limitation, there is no reason to conclude that the parties intended to limit the particular persons or entities that were obliged to perform in a manner that is contradictory to the broad and inclusive language contained in the introductory paragraph. To suggest otherwise is an unwarranted and tortured reading of the CSA." (Footnote added.)

We agree with the court that there was no express limitation in § 4 of the CSA as to which of the defendants had the obligation to remit the UBS litigation proceeds. We disagree, however, with the court's literal interpretation of "the [p]arties hereby agree as follows" language, to hold all of the signatory defendants liable for each and every obligation in the CSA. In accordance with part I of this opinion, the proper interpretation of § 4 of the CSA is in consideration of the other provisions

of the CSA, the LPA, and the circumstances under which the CSA was executed. Conversely, the court, in interpreting the same provision of the CSA to determine which of the defendants were liable for the same nonpayment, failed to consider the LPA or the circumstances under which the CSA was executed. Although not expressly provided for in the CSA, considering the obligations set forth therein in the context of the LPA and the relevant circumstances, the CSA imposes an implied limitation as to which of the defendants were liable for nonpayment of the UBS litigation.

First, under the circumstances, POF cannot be held liable pursuant to § 4 of the CSA because POF was unable to remit the UBS litigation proceeds to the plaintiff. In September, 2009, the plaintiff redeemed its investment in POF, which extinguished its interest in POF except for certain holdbacks to indemnify potential future expenses of POF. When the CSA was executed, on or about April 8, 2011, the plaintiff had no contingent interest in POF and, thus, the CSA did not secure any interest. Rather, § 4 of the CSA secured the plaintiff's contingent interests in two assets that were owned by PCM, not POF. POF, as a distinct hedge fund from PCM, could not have paid the plaintiff the proceeds of the UBS litigation because it had no interest in PCM's portion of the claim. Further, POF was not a signatory to the LPA, which specifically mandated payment as soon as practicable. Therefore, we disagree with the court that POF is liable.

Likewise, we disagree with the court that Schepis and Canelas are individually liable for nonpayment of the UBS litigation proceeds. Although the court found that Schepis and Canelas controlled all of the defendant entities, it previously had rejected the plaintiff's piercing the corporate veil and alter ego theories. See part VI A of this opinion. Thus, pursuant to New York law, Schepis and Canelas would be liable for nonpayment of the UBS litigation proceeds only if they expressly agreed to be individually liable. See *J.N.K. Machine Corp.* v. *TBW, Ltd.*, 155 App. Div. 3d 1611, 1612, 65 N.Y.S.3d 382 (2017) ("[a]ccording to the well settled general rule, individual officers or directors are not personally liable on contracts entered into on behalf of a corporation if they do not purport to bind themselves individually" [internal quotation marks omitted]); *New York Assn. for Retarded Children, Inc., Montgomery County Chapter* v. *Keator*, 199 App. Div. 2d 921, 923, 606 N.Y.S.2d 784 (1993) ("[i]t is well established that an agent of a disclosed principal does not, absent express agreement, become liable individually on a contract relating to the agency"); *American Media Concepts, Inc.* v. *Atkins Pictures, Inc.*, 179 App. Div. 2d 446, 448, 578 N.Y.S.2d 193 (1992) ("[i]n modern times most commercial business is done between corporations, everyone in business knows that an individual stockholder or officer is not liable for his corporation's engagements

unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual" [internal quotation marks omitted]).

Here, Schepis and Canelas signed the CSA in their personal capacities and on behalf of the corporate signatory defendants. Schepis and Canelas signed the CSA individually because that agreement was executed to resolve the 2010 New York action filed against them. As the court recognized, there is no express provision that obligated Schepis and Canelas to be responsible to remit the UBS litigation proceeds, and, thus, they cannot be held individually liable under that agreement. Furthermore, the fact that Schepis and Canelas signed the CSA in their individual capacities, alone, does not support the imposition of individual liability because the CSA does not mandate payment. Instead, it is the CSA read in conjunction with the LPA that obligated payment. Schepis and Canelas had not entered into the LPA in their individual capacities; instead, they executed the agreement as managing members of Pursuit Management,[28] which was the general partner of PCM at the time the LPA was executed. There is no express provision in the LPA that mandates that Schepis and Canelas make payments as soon as practicable in their individual capacities; rather, the withdrawal provision at issue obligates the general partner of PCM to remit withdrawals. In the absence of an express agreement by Schepis and Canelas to undertake an individual obligation in either the CSA or the LPA to remit the UBS litigation proceeds as soon as practicable, they cannot be held individually liable.

Consistent with the foregoing, the language of both agreements, viewed under the circumstances, demonstrates that the defendants that are liable for nonpayment are those that both undertook an obligation, and had the ability, to pay the UBS litigation proceeds. Those defendants are PCM, PIM, and Northeast. Under both the CSA and the LPA, PCM, as the owner of the interest in the UBS litigation at issue, and Northeast, as the general partner of PCM, undertook an obligation to remit the proceeds as soon as practicable after they were realized. On receipt of these proceeds, both PCM and Northeast had the ability to remit to the plaintiff its share as soon as practicable. Furthermore, PIM had an ability to pay the UBS litigation proceeds because it had remitted both the settlement payment and the redemption payment on behalf of the defendants, including PCM, pursuant to the CSA. Indeed, this ability is evinced by the April 28, 2011 letter in which PIM informed the remaining investors in PCM that it was effectuating a mandatory withdrawal of the plaintiff pursuant to the recent execution of the CSA. There is no finding suggesting that PIM no longer had the ability or authority to remit payments to the plaintiff on behalf

of PCM. Therefore, we conclude that PCM, PIM, and Northeast are liable for their failure to remit to the plaintiff its proportionate share of the UBS litigation proceeds.

## VII

The seventh issue presented is whether the court properly determined the amount of damages. The plaintiff and the defendants respectively advance a two-prong challenge to the court's damages award. The defendants claim that the court erroneously awarded damages because it (1) failed to reduce PCM's share of the UBS litigation proceeds by 10 percent to account for PCM Master's other investor, which the parties and the court referred to as PCM offshore, and (2) failed to account for a performance fee reduction from the UBS litigation proceeds. The plaintiff claims that the court erroneously awarded damages because it improperly permitted the defendants to retain the remainder of the UBS litigation holdback, and erroneously found that the division of the UBS litigation proceeds to be 52.8 percent to PCM Master and 47.2 percent to POF Master. We reject all of the parties' claims and conclude that the court properly determined the amount of damages.

Before reaching the parties' claims, we first set forth the court's calculation of damages. As set forth previously, the gross UBS litigation settlement amount was $36 million. After deducting $6.9 million for attorney's fees incurred in pursuing the UBS litigation, the net proceeds from the UBS litigation were $29.1 million. The $29.1 million was then divided between PCM Master and POF Master because both hedge funds had purchased the CDOs from UBS. The court determined that PCM Master was entitled to 52.8 percent and POF Master was entitled to 47.2 percent of those net proceeds.

The court determined, however, that the plaintiff was entitled to only a portion of PCM Master's percentage because the plaintiff was invested in PCM, which was invested in PCM Master, and § 4 of the CSA explicitly applied to PCM's share of the UBS litigation proceeds. The court calculated PCM Master's portion of the net proceeds, 52.8 percent of the $29.1 million net proceeds, to equal $15,364,800. The court further determined that PCM was the sole investor and owned 100 percent of PCM Master and, thus, PCM owned the entirety of the $15,364,800 owned by PCM Master. Accordingly, because the plaintiff's pro rata share of PCM was 32.083612 percent, the court calculated the plaintiff's interest in the UBS litigation proceeds to be $4,929,582.

We next set forth the standard of review applicable to all four of the parties' damages related claims. "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and

the pleadings in the record as a whole . . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . .

"In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court. . . .

"[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *FirstLight Hydro Generating Co.* v. *Stewart*, 328 Conn. 668, 679–80, 182 A.3d 67 (2018). Finally, to the extent that we are required to interpret the court's judgment, our review is plenary. See *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 575.

A

The defendants first claim that the court failed to reduce PCM's share of the UBS litigation proceeds by 10 percent to account for PCM Master's other investor, PCM offshore. The defendants argue that the court erroneously found that PCM owned 100 percent of PCM Master, when the evidence demonstrated that PCM offshore, which is another entity controlled by Schepis and Canelas, owned 10 percent of PCM Master. The defendants contend that the damages award should be reduced because PCM owned only 90 percent of the net UBS litigation proceeds owned by PCM Master. We disagree.

In the present case, the trial court rejected the defendants' 10 percent claim, reasoning that: "By April, 2010, all of the investors of PCM Master other than PCM had redeemed. On May 6, 2009, Schepis and Canelas deposited $1,100,000 into the PCM Master account. This arguably became the only other investment in PCM Master other than PCM. It is this deposit which forms the basis for the defendants' claim that PCM is entitled only to 90 percent interest in the proceeds to which PCM Master is entitled. There are several problems with the claim of the defendants. First, the deposit was made after all other investors in PCM Master other than PCM

had redeemed; second, the deposit was made after the CDOs had been purchased and after [the UBS litigation] had been instituted; and third, the deposit amounted to little more than parking cash, which Schepis and Canelas retained complete control over in order to assert a claim for a percentage of the UBS [litigation] proceeds. This is verified by the fact that in excess of $1,100,000 was withdrawn from the PCM Master account by August, 2010 (eight months before the CSA had been signed). Essentially, the defendants claim that Schepis and Canelas could gain an interest in a valuable claim (which other investors were pledging substantial assets to prosecute) by parking cash in an account after the fact, which cash could be withdrawn or moved without any risk, or at least without risk comparable to that involved in the CDO transactions which gave rise to the UBS litigation. The claim strains credibility. It was an investment after the initial risk had been taken and was withdrawn before the CSA had been executed. It was managed independent of any risk participated in by the PCM investors. To the extent that PCM Master chose to make investments utilizing the cash, any such returns were not shared by the PCM investors. The second problem with the defendants' position is that the defendants had not been forthcoming in their compliance with the court's discovery orders, both in terms of the timeliness of that compliance and in terms of the completeness of that compliance, which hampers their credibility as to this issue. The records and the testimony are simply not supportive of the defendants' position.

"Finally, Schepis' testimony as to this issue is not particularly credible either. His explanations were not complete. They were inconsistent and varied from his earlier testimony during the [prejudgment remedy] proceedings."

In short, the court rejected the defendants' argument on the basis of its findings regarding the lack of credibility of the defendants' position regarding the $1.1 million deposit, their failure to comply fully with discovery, and the lack of credibility of Schepis' testimony. The court specifically cited evidence that Schepis and Canelas, through PCM offshore, made their investment in PCM Master after the CDOs had been purchased, after the CDOs had lost value, and after the UBS litigation had been commenced. Most significantly, the court found, on the basis of the evidence, that the investment was withdrawn prior to the execution of the CSA. All of this evidence supports the court's finding that PCM was the sole investor in PCM Master and, thus, PCM was entitled to all of PCM Master's share of the proceeds from the settlement of the UBS litigation. Further, to the extent that the court's decision is founded on its credibility determinations, we cannot second-guess those determinations on appeal. See *FirstLight Hydro Generating Co.* v. *Stewart*, supra, 328 Conn. 679–80.

Therefore, we conclude that the court's finding that the defendants' 10 percent claim failed was not clearly erroneous.

B

The defendants next claim that the court failed to account for a performance fee reduction from the UBS litigation proceeds. The defendants' argument on appeal is the same one that they made before the trial court: the LPA provides that the general partner of PCM, Northeast at the time, was entitled to a 20 percent performance fee for net economic profit. They argue that, because the LPA governed the UBS litigation and the UBS litigation proceeds were net economic profit, Northeast was entitled to 20 percent of those proceeds. The plaintiff's argument before us is also the same one as it made before the trial court: the UBS litigation proceeds did not constitute net economic profit because those proceeds only partially recouped prior substantial losses incurred in connection with the CDOs.

The court agreed with the plaintiff. It concluded that the UBS litigation proceeds did not represent a net economic profit but merely were a return of part of PCM's investment. Consequently, the court determined that Northeast was not entitled to a performance fee. We agree with the court.

Because the defendants do not challenge the court's factual finding that the UBS litigation proceeds constituted a net loss, we exercise plenary review over the defendants' claim because it requires us to interpret the definitive language of the LPA, which is a pure question of law. See *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 575.

Section 4.02 of the LPA, titled "Allocation of Net Income," governs the allocation of net profits and losses. Section 4.02 (a) provides in relevant part: "[T]here shall be a provisional allocation of net profits . . . or net losses . . . for each calendar year (or other accounting period), to all [p]artners in proportion to the [c]apital [a]ccounts as of the beginning of such period: then, at the end of the calendar year or upon a withdrawal of a limited partner, 20 [percent] of the [l]imited [p]artner's [s]hare of [c]umulative [f]iscal [p]eriod [n]et [e]conomic [p]rofit . . . provisionally allocated to each [l]imited [p]artner for the calendar year . . . allocated to such [l]imited [p]artner's [c]apital [a]ccount since the last reallocation of net profits . . . shall be reallocated to the [g]eneral [p]artner."

Section 1.01 (ab) of the LPA defines "[s]hare of [c]umulative [f]iscal [p]eriod [n]et [e]conomic [p]rofit" to mean, in relevant part, "with respect to each [l]imited [p]artner, an amount determined as of the end of any [a]ccounting [p]eriod including the end of the [f]iscal [y]ear . . . equal to the sum of the amounts (positive

or negative) of [n]et [i]ncome or [n]et [l]oss allocable to such [l]imited [p]artner . . . subject to the following modifications. If a [l]imited [p]artner's [s]hare of [c]umulative [f]iscal [p]eriod [n]et [e]conomic [p]rofit for any [a]ccounting [p]eriod shall be a loss—(i.e., negative amount), then such loss shall carry forward into the next [a]ccounting [p]eriod (and. if necessary, into succeeding [a]ccounting [p]eriods) and will reduce such [l]imited [p]artner's [s]hare of [c]umulative [f]iscal [p]eriod [n]et [e]conomic [p]rofit i[f] any, in such next (or succeeding) [a]ccounting [p]eriod." (Internal quotation marks omitted.)

The court interpreted the foregoing language to mean that "the limited partner's share of cumulative fiscal period net economic profits pursuant to the express terms of the LPA must include prior losses that are carried forward into the next accounting period." The court then reasoned that the profits and losses incurred by the plaintiff as a limited partner in PCM prior to the execution of the LPA on April 1, 2009, including the profits and losses associated with the CDOs purchased from UBS, carried forward. The court relied on § 2.01 of the LPA, which provides that the parties agreed "to form *and continue* the [p]artnership as a limited partnership . . . ." (Emphasis added.) The court also relied on § 3.09 of the LPA, which provides in relevant part: "Each [p]artner's [c]apital [a]ccount shall consist initially of the amount of cash and agreed net fair market value of any other property *which it has contributed* to the [p]artnership as a [c]apital [c]ontribution upon its admission to the partnership . . . ." (Emphasis added.)

The court then held that, "[i]n effect, the [plaintiff] experienced a substantial loss in [its] PCM investment as a result of the defendants' decision to purchase the UBS CDOs (through PCM Master). The settlement of the UBS litigation did not result in a net economic profit; rather it represented a recoupment of part of the loss that PCM had earlier experienced. [Northeast] is not entitled to a performance fee based upon profit because it managed to recoup some of the value that it had previously lost. The language of the LPA does not so provide and actually states the opposite." (Footnote omitted.)

We conclude that the court's interpretation is legally and logically correct. Sections 4.02 (a) and 1.01 (ab) of the LPA, when read together, provide that a limited partner's share of cumulative fiscal period net economic profit of PCM includes past losses that were incurred by PCM. Sections 2.01 and 3.09 of the LPA contemplate that these past losses were carried forward from prior to the execution of the LPA. Thus, the LPA definitively provides that losses incurred by a limited partner prior to the execution of the LPA are to be taken into account when determining cumulative fiscal period net eco-

nomic profit.

In accordance with the foregoing, the court held that the UBS litigation proceeds represented a recoupment of part of the loss that PCM previously had experienced. In essence, the court determined that the UBS litigation proceeds did not constitute a net profit because those proceeds failed to exceed the losses incurred as a result of the purchase and subsequent devaluation of the CDOs. Consequently, because the UBS litigation proceeds constituted a partial recoupment of prior losses, not a net profit, Northeast was not entitled to deduct a performance fee therefrom. Therefore, we conclude that the court properly rejected the defendants' performance fee claim.

C

The plaintiff claims that the court improperly permitted the defendants to retain the remainder of the UBS litigation holdback. The plaintiff maintains that the court found that the $250,000 holdback designated by the CSA to cover expenses incurred in connection with the UBS litigation had not been exhausted. Consequently, the plaintiff argues that the court erroneously failed to award damages for the remainder of the unused UBS litigation holdback. We disagree.

It is undisputed that, pursuant to § 3 of the CSA, the plaintiff was entitled to any unused portion of the UBS litigation holdback. Section 3 (b) (i) of the CSA provides that the redemption payment owed to the plaintiff was "less a holdback in the amount of $250,000 for the purpose of funding necessary costs (other than plaintiff counsel's attorneys fees through trial) associated with the ongoing [UBS litigation] . . . ." Section 3 (b) (ii) provides that "PIM represents and warrants that the holdbacks referenced in [§] 3 (b) (i) reflect [the plaintiff's] pro rata share of the holdbacks that will be assessed with respect to current investors in PCM as of February 28, 2011, and further represents and warrants that use of the holdbacks will be limited to the purposes set forth in [§] 3 (b) (i) and that no part of any prior holdback presently maintained by either of the [f]unds . . . shall be used in connection with the UBS [l]itigation." Section 3 (b) (ii) further provides that "[the plaintiff] shall . . . be entitled to periodic updates on the status of the holdbacks," that the plaintiff will be provided with the opportunity to pay for additional expenses if the holdback is insufficient, and that the plaintiff's interest in the UBS litigation would be extinguished if it failed to pay for such additional expenses.

The court did not address separately whether the plaintiff was entitled to a portion, if any, of the remaining UBS litigation holdback. The court's damages award also did not include any additional funds that could be attributed to a portion of the UBS litigation holdback. As set forth previously, the entirety of the

court's damages award equaled the sum of the plaintiff's pro rata share of PCM's interest in the net proceeds of the UBS litigation, plus interest.

Nevertheless, the court, in a different part of its decision, rejected the defendants' argument that they were permitted to deduct post-CSA expenses from the UBS litigation proceeds. It held, in relevant part: "The plaintiff's obligation to pay post-CSA expenses for the UBS litigation was limited to $250,000, as [its] proportionate share of those expenses. The plaintiff was not obligated to contribute anymore for expenses unless [it], along with other investors, [was] given the voluntary opportunity under the express language of the CSA. The plaintiff was never asked to contribute more to those additional expenses. Moreover, there is insufficient evidence for the court to conclude that the $250,000 holdback specifically earmarked for UBS [litigation] expenses was insufficient to satisfy the plaintiff's obligation for those expenses. The post-CSA expenses incurred as a result of the UBS litigation would have to have exceeded approximately $1,500,000 in order for the plaintiff's $250,000 holdback to be insufficient to cover its proportionate share of expenses. The evidence does not indicate that the post-CSA expenses exceeded that amount." (Footnote omitted.)

The plaintiff argues that the court concluded that the UBS litigation holdback had not been exhausted and, thus, it erroneously failed to award it damages equal to the remainder. We disagree with the plaintiff's interpretation of the court's judgment.

The court definitively concluded that there was *insufficient* evidence to conclude that the UBS litigation holdback had been exhausted. This is critically different from the inverse conclusion that the plaintiff draws, namely, that there was *sufficient* evidence to establish that the UBS litigation had not been exhausted. In short, the court concluded that it was unable to determine whether the holdback had been exhausted, not that the evidence demonstrated that the holdback had not been exhausted. Indeed, the plaintiff recognized this point in its principal appellate brief: "If the trial court intentionally omitted the holdback from the judgment, it could have only been for one reason: it was impossible to quantify how much [the plaintiff] was entitled to receive back because [the court] found that 'there is insufficient evidence' before it to conclude how much of the holdback had been legitimately used."[29]

In light of the court's conclusion that there was insufficient evidence to establish whether the holdback had been exhausted, and in the absence of any discussion by the court as to whether the plaintiff was entitled to a portion of the UBS litigation holdback, we reject the plaintiff's claim.

## D

The plaintiff also claims that the court erroneously found the division of the net UBS litigation proceeds to be 52.8 percent to PCM Master and 47.2 percent to POF Master. The plaintiff argues that the court's finding as to the division of those proceeds between PCM Master and POF Master was erroneous because the court relied on the defendants' calculation, which allegedly was incomplete as a result of the defendants' purported failure to comply fully with discovery regarding this issue. The plaintiff contends that the trial court should have drawn an adverse inference against the defendants for their discovery misconduct, and held that the proper division of the net UBS litigation proceeds should have been 56.23 percent to PCM Master and 43.77 percent to POF Master. We disagree.

The court made its division of the UBS litigation between PCM Master and POF Master on the basis of the following findings. "The defendants . . . claim that the net proceeds need to be divided 52.8 percent to PCM Master and 47.2 percent to POF Master. The court agrees with the defendants in this regard. The CSA clearly indicated that the plaintiff was only entitled to PCM's interest. (PCM, of course, had no interest in POF Master). The plaintiff had earlier withdrawn and redeemed its interest in POF and the CSA contains a broad release concerning any claims arising out of the redemption of the plaintiff's interest in POF. At the time the plaintiff executed the CSA, the UBS litigation had already begun and the amended complaints in that case expressly claimed that both PCM Master and POF Master had purchased the troubled CDOs from UBS. The evidence presented to this court established that the ratio of those purchases between PCM Master and POF Master are consistent with the defendants' claims. That evidence consisted [of] testimony from Berg Simpson, [which was a Colorado law firm that pursued the UBS litigation on behalf of Pursuit Partners and PIM], concerning the nature of the claims made in the UBS litigation, the actual trade tickets evidencing the transactions, the amended complaints in the UBS [litigation], which set forth the transactions by which both PCM Master and POF Master acquired the CDOs. The evidence also demonstrated that the expenses that were incurred in pursuing the UBS litigation were borne in relatively equal amounts by both PCM Master and POF Master. While the [plaintiff] assert[s] that the defendants lack credibility in this regard because Schepis and Canelas have an interest in moving as large a percentage to POF Master as possible because they have a significantly greater interest in POF Master than PCM Master, the court finds the evidence presented sufficient to sustain its finding. Accordingly, the court finds that PCM Master's interest in the net settlement proceeds was 52.8 percent, or $15,364,800."

On appeal, the plaintiff asks this court to override the court's credibility assessments and its weighing of the evidence, which we cannot do. See *FirstLight Hydro Generating Co.* v. *Stewart*, supra, 328 Conn. 679–80. The court specifically rejected the plaintiff's credibility challenge to the position taken by the defendants; on appeal, we cannot second-guess such an assessment. Likewise, to the extent that the plaintiff challenges the court's reliance on the evidence specifically credited in support of its findings, we cannot discredit that evidence on appeal. Further, after review of the evidence cited by the court in support of its conclusion, we conclude that such testimony and exhibits were sufficient to support the court's conclusion.

Moreover, the plaintiff requests that this court reverse the trial court's decision with respect to the division of the UBS litigation proceeds because it failed to impose a negative inference against the defendants for their failure to comply fully with discovery on this issue. See *Glinski* v. *Glinski*, 26 Conn. App. 617, 623, 602 A.2d 1070 (1992) ("[w]hile the trial court may certainly draw adverse inferences from the failure of a party to submit the required financial information, *it is under no obligation to do so*" [emphasis added]); see also *Szegda* v. *Szegda*, 97 Conn. App. 426, 430, 904 A.2d 1266, cert. denied, 280 Conn. 932, 909 A.2d 959 (2006). The plaintiff made the exact same argument to the trial court and it necessarily was rejected because the court did not draw such an inference. While the trial court was permitted to draw such an inference, we decline to reverse that discretionary judgment on appeal. The trial court was in the best position to assess the extent to which the defendants produced credible evidence on this issue, and it clearly concluded that the evidence produced by the defendants was sufficient to support its conclusion. Therefore, we conclude that the court's finding as to the division of the net proceeds of the UBS litigation was not clearly erroneous.

In sum, we conclude that the court properly determined the amount of damages.

### VIII

The defendants next claim that the court improperly granted the plaintiff's motion to increase the amount of the prejudgment remedy. The defendants argue that the filing of an appeal, without more, did not constitute a sufficient basis for the court to modify, pursuant to § 52-278k, the existing prejudgment remedy. We disagree.

The following additional procedural history is relevant to our resolution of this claim. On June 16, 2016, the court granted the plaintiff's application for a prejudgment remedy in the total amount of $5,421,582. On October 14, 2016, the court rendered judgment partially in favor of the plaintiff against certain defendants in

the total amount of $5,422,540, plus 10 percent postjudgment interest per annum. The defendants appealed from that judgment.

On November 8, 2016, during the pendency of this appeal, the plaintiff, pursuant to § 52-278k, filed a motion with the trial court seeking modification of the previously secured prejudgment remedy attachment amount, seeking to secure from PCM, POF, PIM, Schepis, Canelas, and Northeast an additional $947,731 that it anticipated would accrue during the pendency of this appeal. The plaintiff calculated the $947,731 accrual of interest by multiplying the per diem interest on the judgment, which the plaintiff determined on the basis of the court's award of 10 percent interest per annum on its award of $5,422,540 in damages, by 564.3, the plaintiff's estimation of the average duration of the pendency of similar civil cases before this court, and then adding the probable additional costs associated with levy and execution. In support of its calculation, the plaintiff's attorney submitted an affidavit and attachments that detailed the duration of several recent Appellate Court cases. On December 16, 2016, the defendants filed an opposition to the plaintiff's motion to increase the prejudgment remedy in which they argued, among other things, that § 52-278k does not permit the upward modification of a prejudgment remedy in the present circumstances.

On January 4, 2017, after a hearing, the court granted the plaintiff's motion to increase the prejudgment remedy amount by $947,731, to a total of $6,369,313. The court held that "§ 52-278k provides that the court may modify a prejudgment remedy 'at any time' 'as may be warranted by the circumstances.' It is well established that the prejudgment remedy statutes apply and are applicable subsequent to the rendering of a judgment in the trial court, which trial court judgment is pending appeal. *Gagne* v. *Vaccaro*, 80 Conn. App. 436, 451–54, [835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004)]. Based upon the evidence at trial and the circumstances of the pending appeal, the court finds probable cause that the plaintiff will ultimately obtain a final judgment against those parties against whom the court has rendered judgment in the amount of $6,369,313, which amount includes interest at the rate of 10 percent per annum for the likely period of appeal and probable execution fees. Of course, this is without prejudice to the defendants' right to request a downward modification should they prevail on their pending motion . . . which seeks adjustment of the previously ordered interest rate, and the right of either party to seek further modification 'as may be warranted by the circumstances.' " The defendants thereafter filed an amended appeal to challenge this ruling.

We next set forth the standard of review and legal principles relevant to this claim. "A prejudgment rem-

edy means any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . . General Statutes § 52-278a (d)." (Internal quotation marks omitted.) *ASPIC, LLC* v. *Poitier*, 179 Conn. App. 631, 639, 181 A.3d 593 (2018). "A prejudgment remedy is available upon a finding by the court that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . . General Statutes § 52-278d (a) (1). . . . Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. . . . When reviewing a trial court's order on a motion for a prejudgment remedy, our role is fairly limited. . . . We will not upset a prejudgment remedy order in the absence of clear error . . . viewing the evidence in the light most favorable to the plaintiff." (Citations omitted; internal quotation marks omitted.) *J.E. Robert Co.* v. *Signature Properties, LLC*, 309 Conn. 307, 338–39, 71 A.3d 492 (2013).

The authority for a court to modify an existing prejudgment remedy is afforded by § 52-278k, which provides: "The court may, upon any application for prejudgment remedy under section 52-278c, 52-278e, 52-278h or 52-278i, modify the prejudgment remedy requested as may be warranted by the circumstances. The court may, upon motion and after hearing, at any time modify or vacate any prejudgment remedy granted or issued under this chapter upon the presentation of evidence which would have justified such court in modifying or denying such prejudgment remedy under the standards applicable at an initial hearing."

The defendants recognize that a prejudgment remedy may be granted while the case is on appeal. See *Gagne* v. *Vaccaro*, supra, 80 Conn. App. 454 ("a prejudgment remedy is available to a party who has prevailed at the trial level and whose case is on appeal"); *Tadros* v. *Tripodi*, 87 Conn. App. 321, 335 n.9, 866 A.2d 610 (2005) ("[d]espite the apparent contradiction in terms, a prejudgment remedy may be granted after the entry of judgment but before appellate disposition in order to protect assets to satisfy the judgment"). Instead, the defendants argue, without citing any legal authority in support, that the fact that they took "an appeal, without more, [does not] constitute a sufficient basis to amend an existing [prejudgment remedy]."

Viewing the evidence before the court in the light most favorable to the plaintiff, we conclude that it was not clear error for the court to have increased the

amount of the prejudgment remedy. The court made its probable cause determination "[b]ased upon the evidence at trial and the circumstances of the pending appeal . . . ." The evidence at trial established that certain defendants were liable to the plaintiff for a total of $5,422,540, and the court awarded the plaintiff 10 percent postjudgment interest per annum. The court also considered the fact that the defendants took an amended appeal from the October 14, 2016 judgment. Further, the court credited the plaintiff's calculation as to the amount of interest that it estimated would accrue on appeal. The plaintiff's calculation, as supported by an affidavit, was made in part on the basis of the average duration of the pendency of similar cases before this court. Accordingly, the court made its decision on the basis of the amount of the judgment rendered against the defendants, the court's award of postjudgment interest, the fact that the defendants took an amended appeal, and the average pendency of similar civil cases before this court. Viewing these facts in the light most favorable to the plaintiff, it was not clear error for the court to have increased the amount of the prejudgment remedy.[30]

## IX

The defendants' final claim is that the court improperly granted the plaintiff's motion for postjudgment discovery in connection with the court's upward modification of the prejudgment remedy amount. We conclude that this claim was not preserved properly, and, thus, we decline to review it.

We begin by setting forth the legal principles relevant to whether a claim properly was preserved for appellate review. "It is well settled that [o]ur case law and rules of practice generally limit [an appellate] court's review to issues that are distinctly raised at trial. . . . [O]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Internal quotation marks omitted.) *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 695, 167 A.3d 351 (2017), cert. denied,    U.S.    , 138 S. Ct. 2583, 201 L. Ed. 2d 295 (2018); see also Practice Book § 60-5 ("court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). "[T]he determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court [and the opposing party] on reasonable notice

of that very same claim." (Internal quotation marks omitted.) *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702 (2018).

The following additional procedural history is relevant to this claim. On November 8, 2016, during the pendency of this appeal, the plaintiff, pursuant to Practice Book § 13-13, filed a motion with the trial court seeking supplemental asset disclosure from the defendants against which judgment had been rendered, seeking to secure the additional attachment pursued by its motion to modify the amount of the prejudgment remedy. On December 16, 2016, the defendants filed an opposition to the plaintiff's motion to increase the prejudgment remedy, but they did not file a written objection to the plaintiff's motion seeking supplemental asset disclosure. Furthermore, in their objection to the motion to modify, the defendants did not advance any counterargument to the plaintiff's motion for supplemental asset disclosure.

At the hearing held on December 22, 2016, regarding the plaintiff's motions, the defendants' counsel conceded that there was no written objection filed to the plaintiff's motion for supplemental asset disclosure. Indeed, the defendants' counsel, when asked whether he had a comment on the motion for disclosure of assets, provided the following response: "Well . . . the reason I didn't object [was] because I have to imagine, without prejudice again, that if the [c]ourt increased the [prejudgment remedy] . . . the [c]ourt was going to grant . . . I haven't seen—you know, and I call it pretty fair—I haven't seen a [prejudgment remedy] where the [c]ourt said, well, now I've granted a [prejudgment remedy], but I'm not going to let you . . . disclose the assets. I don't think though that given that the disclosure was who's claiming what, I happen to agree that as long as the gross amount has been attached, that's what counts. I don't think you get each . . . defendant doesn't have to put up that . . . the entire amount."

On the basis of the foregoing, we conclude that the defendants failed to preserve properly their claim that the court lacked authority to grant the plaintiff's supplemental motion for disclosure of assets. The defendants did not file a written objection and they did not make a written counterargument. When asked whether they had any comment on the motion, the defendants' counsel acknowledged that he was not aware of any court that denied a motion for disclosure after it had granted a prejudgment remedy. The defendants' counsel took the position that it was a rare occurrence that a court actually would deny such a motion under the circumstances. Therefore, we decline to review this claim because it was not properly preserved.

The judgment is reversed in part as to counts one and two of the plaintiff's complaint and the case is remanded with direction to render judgment in favor

of POF, Schepis, and Canelas on those counts; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Pursuit Partners did not appeal from the judgment of the trial court and is not involved in this appeal. Our references to the defendants do not include Pursuit Partners.

[2] As set forth subsequently in this opinion, the court rendered judgment in favor of the plaintiff against PCM, POF, PIM, Schepis, Canelas, and Northeast on two of the seven counts of the complaint, in favor of all of the defendants on the remaining counts of the complaint, and in favor of the plaintiff on the defendants' counterclaim.

[3] A "hedge fund" is "[a] specialized investment group—[usually] organized as a limited partnership or offshore investment company—that offers the possibility of high returns through risky techniques such as selling short or buying derivatives." Black's Law Dictionary (9th Ed. 2009).

[4] The court did not make any factual findings as to the role of Pursuit Partners in the hedge fund structure.

[5] The plaintiff did not invest directly in POF Master or PCM Master.

[6] According to Wikipedia, a popular encyclopedia website, which is accessible to the public free of charge and updated collaboratively by the site's visitors, a CDO is "a type of structured asset-backed security . . . . Originally developed as instruments for the corporate debt markets, after 2002 CDOs became vehicles for refinancing mortgage-backed securities . . . . Like other private label securities backed by assets, a CDO can be thought of as a promise to pay investors in a prescribed sequence, based on the cash flow the CDO collects from the pool of bonds or other assets it owns." (Footnotes omitted.) Wikipedia, the free encyclopedia, "Collateralized debt obligation," (last modified September 16, 2019), available at https://en.wikipedia.org/wiki/Collateralized debt obligation (last visited September 26, 2019).

[7] A "holdback" is "[a]n amount withheld from the full payment of a contract pending the other party's completion of some obligation . . . ." Black's Law Dictionary, supra.

[8] Approximately during the same time, the United States Securities and Exchange Commission (SEC) began an investigation of the defendants. After receiving a letter from DLA Piper indicating that the SEC proceeding could cost as much as $10 million, the defendants notified the investors, including the plaintiff, of the SEC investigation, but not the estimate of costs. On receipt of this letter, and pursuant to the plaintiff's request, Reed Smith contacted the SEC in 2010, 2011, and 2012, to learn more about the investigation. Ultimately, the SEC investigation was resolved without penalty or sanction.

[9] Specifically, § 3 (b) (iii) of the CSA defined the total NAV in PCM as of February 28, 2011, to be $5,822,390, and the plaintiff's pro rata share of the NAV in PCM as of February 28, 2011, to be $1,868,033. Consequently, the court found that the CSA defined the plaintiff's percentage of the pro rata share of the NAV in PCM as of February 28, 2011, to be approximately 32.083612 percent ($1,868,033 divided by $5,822,390).

[10] As of the date of oral argument before this court, the 2013 New York action was still pending before the New York Supreme Court. See *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, New York Supreme Court, County of New York, Index No. 152104/2013.

[11] The court inconsistently found that this letter was sent on April 22, 2013, and April 22, 2014. This discrepancy is immaterial to our decision.

[12] The plaintiff does not seek the remaining portion of the LBIE claim, as that claim is the subject of the 2013 New York action.

[13] The parties stipulated that the evidence introduced at the prejudgment remedy proceeding would constitute evidence in the subsequent full trial on the merits.

[14] On appeal, the defendants only challenge the court's judgment in favor of the plaintiff on the breach of contract count in the counterclaim, and do not challenge the court's judgment in favor of the plaintiff on its fraud count in the counterclaim.

[15] The parties on appeal are in agreement that New York substantive law governs this claim because of the choice of law provision in § 12 of the CSA, which provides in relevant part: "This [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of New York."

[16] Ordinarily, under New York law, the first determination to be made is whether the contract, under the circumstances, is ambiguous or unambigu-

ous. See *In re Estate of Wilson*, 138 App. Div. 3d 1441, 1442, 31 N.Y.S.3d 331 (2016); see also *Ellington* v. *EMI Music, Inc.*, 24 N.Y.3d 239, 244, 21 N.E.3d 1000, 997 N.Y.S.2d 339 (2014). Nevertheless, because neither the trial court nor the parties frame the issue in that manner, we likewise decline to take that approach.

[17] This conclusion also disposes of the defendants' alternative argument that the plaintiff is not entitled to any of the proceeds from the UBS litigation because Pursuit Management exercised its right under the LPA on April 22, 2013 to "mandatorily withdraw" the plaintiff as a limited partner of PCM and, at that time, the UBS litigation had no value because it had been dismissed. Because the plaintiff was withdrawn as a limited partner when the CSA was executed, it could not be withdrawn a second time. Furthermore, the defendants' argument that the UBS litigation had no value when it was dismissed in 2012 is disingenuous in light of their counsel's December 4, 2012 letter to the limited partners, including the plaintiff, telling them that despite the dismissal, counsel expected ultimately to prevail in the litigation.

[18] We disagree with the defendants' interpretation of the court's decision as concluding only that they had breached the CSA; rather, the court concluded that certain defendants had breached both the CSA and the LPA when they failed to remit the contingent assets as soon as practicable. See *In re James O.*, 322 Conn. 636, 649, 142 A.3d 1147 (2016) (interpretation of court's decision presents question of law).

[19] The court, without extensive elaboration, specifically concluded that the plaintiff's actions constituted a partial breach that caused the defendants to suffer no damages.

[20] We emphasize that the payment of the LBIE claim proceeds is the subject of the pending 2013 New York action; see footnote 10 of this opinion; and those proceeds are only indirectly implicated here as part of the defendants' counterclaim in which they alleged that they were excused from remitting the proceeds from the UBS litigation.

[21] The gravamen of the defendants' argument on this point is founded in anticipatory repudiation, which requires "proof of a definite and final communication by [the] plaintiff of its intention not to perform . . . ." (Citation omitted.) *1625 Market Corp.* v. *49 Farm Market, Inc.*, 165 App. Div. 3d 426, 426, 84 N.Y.S.3d 142 (2018). This argument is inapposite because there is no allegation that the plaintiff communicated to the defendants that it intended to avoid its obligations under the agreement prior to engaging in the contested communications, or at any time.

[22] The defendants also argue that the plaintiff cannot prevail on its breach of the implied covenant of good faith and fair dealing claim because it is merely a recast breach of contract claim. This argument, unlike the defendants' similar claim asserted in part IV of this opinion, was not raised before the trial court and, therefore, it is not properly preserved. See *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702 (2018) (claim is properly preserved if "articulated below with sufficient clarity" [internal quotation marks omitted]); *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 695, 167 A.3d 351 (2017) (claim is not reviewable if raised for first time on appeal), cert. denied,     U.S.    , 138 S. Ct. 2583, 201 L. Ed. 2d 295 (2018); see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial").

[23] The plaintiff argues in one sentence, incorporating its contentions advanced in part V of this opinion, that the court improperly determined that New York law, as opposed to Connecticut law, applies to the plaintiff's conversion claim. We decline to review this claim because the plaintiff offers no independent analysis with respect to the applicability of § 12 of the CSA to its conversion claim. See *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." [Internal quotation marks omitted.]); see also *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 268 n.6, 25 A.3d 632 (2011) (disavowing multiplicity of claims approach).

[24] On appeal, the plaintiff also argues that § 12 of the CSA did not bar its Connecticut statutory causes of action because public policy mandates that Connecticut law apply. We decline to review this claim because it is raised for the first time on appeal and, therefore, is not properly preserved. See *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702

(2018) (claim is properly preserved if "articulated below with sufficient clarity" [internal quotation marks omitted]); *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 695, 167 A.3d 351 (2017) (claim is not reviewable if raised for first time on appeal), cert. denied,    U.S.   , 138 S. Ct. 2583, 201 L. Ed. 2d 295 (2018). In its written opposition to the defendants' motion to strike, the plaintiff did not argue that § 12 of the CSA was violative of the public policy of Connecticut. At oral argument on the defendants' motion to strike, although the plaintiff's counsel argued in one sentence that Connecticut has an interest in the resolution of this dispute, the plaintiff's counsel did not advance an oral argument that § 12 of the CSA violated the public policy of Connecticut, that New York had no substantial relationship to the parties or transaction, or that New York law is contrary to the fundamental policy of Connecticut. See *Elgar* v. *Elgar*, 238 Conn. 839, 850, 679 A.2d 937 (1996) (concluding that Connecticut law favors choice of law provisions unless application of foreign state law violated Connecticut public policy). To entertain this argument for the first time on appeal would constitute an ambush of the trial judge and the defendants. See *Forgione* v. *Forgione*, 186 Conn. App. 525, 530, 200 A.3d 190 (2018).

[25] On appeal, the plaintiff acknowledges that New York contractual interpretation principles apply to determine whether the language of § 12 of the CSA bars its Connecticut statutory causes of action, yet, it also argues that Connecticut law leads to the same result. Likewise, the defendants inconsistently argue that the contractual interpretation principles of both states apply. We apply the contract interpretation principles of New York, not Connecticut, because that is the law the parties, in the sentence prior to the one at issue, specifically agreed applied to the interpretation of the CSA: "This [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of New York."

[26] As outlined previously in this opinion, § 4 of the CSA provided in relevant part that "PCM owns certain contingent assets that were valued at zero . . . for purposes of calculating PCM's NAV. These contingent assets include (a) PCM's proportionate interest in the UBS [l]itigation; and (b) PCM's interest in [the LBIE claim]. Nothing herein . . . shall affect in any way [the plaintiff's] pro rata share . . . of the contingent assets as of February 28, 2011. It is further understood that [the plaintiff's] continued interest in the contingent assets shall be governed by the [LPA] . . . ."

[27] As set forth previously in this opinion, § 3 of the CSA mandated that PIM pay the plaintiff the settlement payment and the redemption payment.

[28] The version of the LPA entered into evidence and included in the defendants' appendix on appeal is unsigned. Nevertheless, typed names below the signature lines contained in the LPA support this interpretation.

[29] The plaintiff additionally argues on appeal that it "satisfied its burden to prove that [the] defendants held $250,000 of its money as a UBS litigation holdback that was now due to be returned; only [the] defendants could prove how much of that legitimately remained and, having failed to do so or to produce the relevant records, the court should have awarded the full $250,000 to [the plaintiff]." Nevertheless, the plaintiff did not make this argument before the trial court and, thus, it is not properly preserved. See *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702 (2018) (claim is properly preserved if "articulated below with sufficient clarity" [internal quotation marks omitted]); *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 695, 167 A.3d 351 (2017) (claim is not reviewable if raised for first time on appeal), cert. denied,    U.S.   , 138 S. Ct. 2583, 201 L. Ed. 2d 295 (2018).

[30] We recognize that the effect of our conclusion that the court properly increased the prejudgment remedy, which was entered against PCM, POF, PIM, Schepis, Canelas, and Northeast, is limited by our determination that only PCM, PIM, and Northeast are liable to the plaintiff on its complaint. See part VI of this opinion. The defendants, however, do not argue that the court improperly increased the amount of the prejudgment remedy against only certain parties. Therefore, we do not reach that issue.